REGAN, Judge.
The plaintiff, American Employers’ Insurance Co., filed this suit as the subrogee of its insured, Frederick J. Forstall, Inc., against the defendant, Emile M. Babst Co., endeavoring to recover the sum of $4,053.00, representing damages which it paid on behalf of its insured to the Monteleone Hotel for the repair of several rooms which it asserts were damaged as a result of the negligence of the defendant in that it failed to properly weatherproof a hole which it cut in the roof thereof in the performance of a subcontract relating to various plumbing installations.
The defendant answered and asserted that the contract between it and the plaintiff’s insured contained exclusions which specifically relieved it of any obligation to perform “patching” work in conjunction with its plumbing installations.
From a judgment in favor of the plaintiff in the amount of $2,500.00 [1] the defendant has prosecuted this appeal.
*252 The record reveals that the plaintiff’s insured, Frederick J. Forstall Co., Inc., was the general contractor for various renovations and additions to the Monteleone Hotel in the city of New Orleans. Forstall subcontracted the plumbing and air-conditioning work to the defendant. The subcontract, which forms part of the subject matter of this litigation, was entered into on July 12, 1963. Incorporated therein were certain exceptions to work called for in the prime contract, one of which was designated by the defendant as “patching”.
On January 6, 1964, the defendant cut a hole in the roof of the ninth floor,[2] through which pipe was extended. Shortly thereafter, a dispute arose between the defendant and the plaintiff’s insured over whose responsibility it was under the subcontract to close the hole around the newly installed pipe. As will be expanded upon hereinafter, the agreement reached at this time developed into a dispute. However, it is undisputed that an employee of Forstall installed waterproof paper and mastic around the hole, and the employees of the defendant poured hot tar thereon in an effort to seal the opening and make it water-tight.
Several days later, a heavy rain occurred and the patch failed, which of course, provoked this litigation. The plaintiff, as the liability insurer of Forstall, paid the Monte-leone for the damage incurred as the result of leaking water. Plaintiff then filed this suit as Forstall’s subrogee to recover from Babst the amount of money which it paid therefor to the Monteleone.
Plaintiff now contends that despite the language incorporated in the subcontract excluding “patching” as an obligation of the subcontractor, the defendant is nevertheless responsible for the closing of the hole referred to hereinabove because it did not exclude “temporary weatherproofing” therefrom. In addition thereto, while a Forstall employee actually assisted in performing the work, plaintiff insists that Babst is liable for any negligence upon his part since he was its borrowed servant.
The prime contract between Forstall and the Monteleone contained specifications for plumbing and air-conditioning. Specification No. 5 for the plumbing referred to-“Cutting and Patching” and provided:
“Same as specified hereinbefore for Air-Conditioning.”
Specification No. 7 for the air-conditioning was entitled “Openings, Cutting, and Patching”. This specification was subdivided into five parts as follows :
“A. New Construction — Ascertain that all openings, shafts, chases, furred spaces, etc., required for the work or to conceal any of the work in any part of the structure are properly located and of ample size. Furnish and install, during progress of construction, all necessary sleeves, thimbles, hangers, inserts, etc., at such times and in such a manner as not to delay or interfere with the work of other contractors. Where any such work has not been done and where the proper installation of all materials and equipment included in these specifications or governed thereby requires cutting, drilling, chipping or fitting, do such necessary work and also perform, in a manner approved by the Architect such patching and repairing as necessary to restore the construction to a condition existing at the time of commencement of such cutting, drilling, etc. Before doing any cutting and patching, obtain permission of the Architect and follow his instructions as to how such proposed work shall be done, and if the Architect deems it of sufficient importance, the work shall be done by others at the expense of this contractor.
“B. Existing Construction — Cutting and patching of existing construction will be done under other divisions of *253 the work; the Contractor shall layout and mark all openings in the building necessary for proper installation of his work, and he shall be responsible for determining that openings are marked and cut at such times as to avoid delay in his work or the work of other contractors.
“C. Fill in, cover, caulk, flash or othcnvise make weatherproof, as required, all openings made in the building for the work. Upon installation of his work, contractor shall be responsible for temporary weatherproofing protection until permanent flashing, caulking, etc., has been completed. (Italics ours)
“D. Caulk, pack or otherwise make all openings through floors and walls tight to prevent excessive leakage of air from one space to another.
“E. See details on plans of special treatment of openings.”
On May 20, 1963, in response to For-stall’s request, Babst submitted a bid for the plumbing and air-conditioning work, in which it specifically excluded certain work called for in some of the drawings, and also excluded “Patching and/or repairing of walls, roofs, floors, etc.”. This bid, with its exceptions and exclusions, was later incorporated into the subcontract entered into two months later.
Thus, as we have said, the defendant insists that it was not obligated to close the hole which existed around the newly installed pipe since this was excluded from the bid, and consequently from the subcontract. This exclusion, it asserts, eliminates temporary as well as permanent patching, and therefore relieved it from any obligation to perform “temporary weatherproofing”. A reference to subparagraph A of specification No. 7 reveals, in our opinion, that the word “patching” refers to the permanent restoration of the building to its condition as it existed before the commencement of the work. This interpretation is substantiated by virtue of the testimony of Harry Kovner, the job superintendent of the defendant company, who stated unequivocally that in the construction industry the word “patching” means corrective work of a permanent nature, while temporary stop-gap operations are referred to as “temporary weatherproofing”.
In addition thereto, it would tax our credulity to believe that a subcontractor would submit and a contractor would accept a bid which affords the subcontractor carte blanche to cut a hole in a roof, perform the necessary work therein, and then abandon the site without first securing the premises, at least in a temporary manner, from the possibility of damage from the elements. Moreover, after analyzing the specifications of the prime contract, the defendant very obviously chose to exclude only “patching” from his bid, and in view of Kovner’s testimony, referred to above, we are convinced that the defendant recognized and accepted the fact that subparagraph 7 C specifically imposed upon the defendant the duty to provide temporary weatherproofing protection upon installation of his work.[3] We therefore conclude that the intention of the defendant was to exclude only permanent patching in its bid, and consequently it was obligated under the subcontract to make the site temporarily weatherproof.
In view of the foregoing conclusion, we must now decide who is liable for the negligence of the Forstall employee who actually performed the weatherproofing work. To reiterate, plaintiff insists that the worker was the borrowed servant of the defendant, and that the defendant consequently was liable for his negligence in conformity with the rationale of respondeat superior.
The landmark case in Louisiana relative to the borrowed servant doctrine emanated *254 from Benoit v. Hunt Tool Co.[4] Therein the organ for the Supreme Court recognized and discussed two competing tests in assessing vicarious liability between two possible masters; they are the “control test” and the “whose business” test. The court rationalized in connection therewith as follows :
“It is a well settled principle of law that the master is liable for the torts •of his servant committed in the scope .and course of his employment, but it is •often difficult where two possible masters are involved to determine which is liable for the tort, and to determine such liability we must look to the doctrine of the borrowed servant or employee pro hac vice. In determining liability under this doctrine in some •cases the courts have imposed liability ■on the person in whose business the ■employee was engaged at the time the tort was committed. In others the test has been the right of control over the servant at the time the tort was committed. It has been pointed out that in applying the latter test it is often •difficult to decide just what fact or facts constitute control.”
The judge then endeavored to reconcile the two tests by pointing out that in order to determine whether a given case falls within one category or the other the court must decide whose work is being performed, a question which is usually answered by ascertaining who possesses the power to control and direct the servants in the performance of their work.[5]
There exists no doubt in this case that the work being performed by the For-stall employee was the contractual obligation of the defendant. The defendant nevertheless has laboriously endeavored to show that the plaintiff’s insured should be held liable for the negligent performance of its employee since he was supervised by a carpenter- — foreman who was admittedly the worker’s immediate superior. However, a careful examination of the record reveals that there is no definite evidence that at the time the laborer was making the hole weatherproof he was under the supervision of his immediate superior. The plaintiff’s construction superintendent, Henry Williams, clearly stated that he loaned the services of the worker to the defendant. Harry Kovner, however, made the contrary assertion on behalf of the defendant.[6] trial judge chose to believe the plaintiff’s evidence, and we cannot say that he committed reversible error in so doing.
This case does not pose the usual, or more common situation in which the borrowed servant doctrine is invoked. In most instances, the court is confronted with a fait accompli consisting of actions taken or work performed which is not clearly under the purview of a contractual provision deliniating the questioned activity as the obligation of one employer or the other. In such cases, the power of control is resorted to in a judicial effort to determine the ultimate and controlling question of whose work was being performed when the tort occurred. In this case, however, we are fortunate enough to have the ultimate question answered in the contract: the employee was actually performing the defendant’s work. This, together with the trial judge’s finding of fact that the worker was not under the supervision of the plaintiff’s insured, leaves no doubt that the defendant is liable for the damage caused by the defective weatherproofing.
*255 In conclusion, we re-iterate, for the purpose of emphasis, that in determining liability for the actions of a borrowed servant, one of the questions usually posed, is, who possessed the right and power of control. The right and power to control obviously carries with it the corresponding obligation to exercise control. If such control is in fact not exercised, either deliberately or inadvertently, the borrowing employer cannot be heard to complain, in an effort to exculpate itself from liability, that the worker was not supervised by him, and therefore was not his responsibility.
For the foregoing reasons, the judgment of the lower court is affirmed. All costs incurred herein are to be paid by the defendant.
Affirmed.

. This amount was ultimately stipulated as the actual damages which wore incurred.

. At this time the ninth floor roof was the roof of the entire building. Later, however, several other floors wore added thereto.

. It is significant to emphasize that work of this nature was subsequently pcr-formed by the defendant without protest.

. 219 La. 380, 53 So.2d 137 (1951).

. McCutchen v. Fruge, La.App., 132 So.2d 917 (1961).

. An unresolved question is whether or not the defendant was charged for the 'worker’s services by plaintiff’s insured. Forstall’s employees testified that such a charge was made, but no books or records were brought into court to confirm this statement.