VANCOUVER PLYWOOD COM-
PANY, INC.,

v.

NATIONAL AUTOMOBILE AND CASU-
ALTY INSURANCE COMPANY et al.

Civ. A. No. 16732.

United States District Court,
W. D. Louisiana,
Shreveport Division.

Jan. 15, 1975.

Merritt B. Chastain, Jr., Smitherman, Smitherman, Lunn, Hussey & Chastain, Shreveport, La., for plaintiff.

Val Irion, Lunn, Irion, Switzer, Johnson & Sally, Shreveport, La., for defendant National Automobile and Cas. Ins. Co.

Henry A. Politz, Booth, Lockard, Jack, Pleasant & LeSage, Shreveport, La., for defendant George W. Greer.

James Robert Jeter, Cook, Clark, Egan, Yancey & King, Shreveport, La., for defendant Steelcraft.

DAWKINS, Senior District Judge.

### OPINION

In 1970, plaintiff, Vancouver Plywood Company, Inc., (Vancouver), a Louisiana corporation, entered into separate contracts with defendants Steelcraft Corporation (Steelcraft), a Tennessee corporation, and George W. Greer, a citizen of Texas, to construct a new dry refuse burner upon the premises of Vancouver's Florien, Louisiana plant. During construction of the incinerator, the boom of a crane being used to lift prefabricated steel panels in place collapsed, causing substantial damage to the then partially erected new burner.

Vancouver filed this action for damages against Greer and his liability insurer, National Automobile and Casualty

Insurance Company (National) in the First Judicial District Court of Caddo Parish, Louisiana. On April 30, 1971, the case was removed here. After removal, Steelcraft was named as a principal defendant in an amended complaint filed by Vancouver.

National then filed a motion for summary judgment, seeking to be dismissed as a party, on the ground that the provisions of its policy of insurance in favor of Greer did not provide coverage for the accident. We denied the motion. It now appears that National has abandoned this contention so that any monetary award against Greer emanating from damage to Vancouver's refuse burner may be satisfied out of Greer's policy with National.[1]

Vancouver claims that Greer and his liability insurer, National, are liable *in solido* with Steelcraft for damages to the partially erected incinerator and certain additional damages caused by the alleged negligence of employees of both Greer and Steelcraft. Vancouver also contends that National is liable to it for penalties and attorney's fees because of National's alleged arbitrary refusal to pay Vancouver's claim.

Greer urges alternative grounds as a basis for denial of liability. He claims that no member of his crew was negligent and, alternatively, that they were borrowed servants of Vancouver or Steelcraft so that their negligence, if any, may not be imputed to him. Greer also has counter-claimed against Vancouver for $5,872.80 withheld from the amount due Greer for work performed pursuant to his contract with that company. Further, Greer has cross-claimed against National for his expenses of litigation, including reasonable attorney's fees, alleging that National's refusal to provide him with a defense in this action was arbitrary, capricious, and without probable cause; this cross-claim includes a claim for indemnity under his policy for the amount of any judgment rendered against him.

Steelcraft also disclaims any responsibility for Vancouver's losses. Among its contentions are that its employee at the job site, Donald Gray, at the time of the accident was a borrowed servant of Vancouver so that his negligence, if any, should be imputed to the latter and not to Steelcraft; alternatively, that, in its purchase order, Vancouver granted complete indemnity to Steelcraft for all losses suffered during construction of the incinerator; in the further alternative, that the same purchase order freed Steelcraft from responsibility for any consequential damages.

Finally, National, who refused to give any indication that it was defending Greer until it filed post-trial briefs in this matter, raises the same basic defenses against liability as does Greer. It also resists Vancouver's claim that its denial of coverage was arbitrary, capricious, and without probable cause.

We turn now to a complete discussion of the full facts of these controversies.

As noted, in 1970, Vancouver decided to replace its worn-out incinerator with a new one. To accomplish this, it was necessary to obtain the services of a consulting engineer, the parts for the incinerator itself, and an erection crew to install it. Howard W. Bullard, who was a consulting engineer for Vancouver on other projects, was retained. Steelcraft agreed to furnish the burner parts and a "working supervisor" to instruct the erection crew in assembling the burner. Vancouver said that it would provide a "working supervisor" and erection crew.

---

1. National also alleged that Greer had breached his contract of insurance by admitting his liability to Vancouver in writing. This contention was based upon Greer's signing an agreement with Vancouver allowing the latter to withhold 30% of the amount due for Greer's services to assure payment for damages to the incinerator.

However, after trial, it apparently became clear to National, as it did to us, that the agreement mentioned clearly was not an admission of liability. No mention of this issue was made by National in its post-trial briefs. Consequently, we find this meritless claim has been abandoned.

It then contracted with Greer to provide the erection crew, motor crane and crane operator, and all tools, rigging, scaffold, etc., necessary to erect the burner.

Before construction began, Vancouver had a concrete base prepared upon which the new burner was to be erected; it also prepared the site upon which a Lorain Moto-Crane was to be placed for use on the job. Some of Greer's employees then "spotted" the crane on that site. However, it was "spotted" in such a manner that it was required to make its heaviest lifts from its side instead of from the rear of the crane. It is undisputed that the crane's safe lifting capacity was reduced when operating over its side rather than its rear.

The crane had an effective "boom length" of about 150 feet. In other words, it could lift objects approximately 150 feet from the cab of the crane, which was attached permanently to the bed of a truck.

On November 23, 1970, the first ring of the steel fabricated panels of the cone-shaped incinerator had been permanently bolted to the prepared concrete base. Work then was commenced upon installation of the second, higher ring of panels. Three panels were lifted and bolted to each other and to the top of the first ring of panels. During placement of the first two panels, which were bolted together and lifted simultaneously, Steelcraft's "working supervisor," Don Gray, injured a tooth, which required immediate dental attention. Consequently, he was not present when the next single panel was lifted into place. He did return to the scene, however, before the next *double* panel was lifted. It was during this lift that the crane's boom collapsed.

Exactly what took place just prior to the accident is in dispute. But it is not seriously controverted that this lift required the crane to "boom out" almost 100 feet, resulting in a major reduction of its lifting capacity; and expert testimony clearly shows that the particular lift, given the weight to be lifted, the "boom out" required, and the fact that the lift was over the crane's side, was unsafe. Therefore, we must ascertain whether the "last lift" negligently was made, and, if so, who was responsible legally.

■ Greer's crane operator, W. R. Morrison, testified he was aware that the crane was overloaded; in fact, that he "knew" the crane would fall if he went ahead. He said he told Don Gray of the danger but that Gray told him to proceed because the crane could handle it. He then appealed to Bill Greer, the crew's foreman, who told him to follow Gray's instructions. Contrarywise, Gray flatly denies speaking with Morrison prior to the accident. We find Gray's testimony on this point to be not credible. The testimony of other members of Greer's crew supports Morrison's account; Gray's self-interested testimony is unsupported and, in our judgment, unbelievable. Therefore, we find that Gray, together with Bill Greer and Morrison, clearly was negligent in the performance of his duties.

Morrison was negligent in making a lift which he "knew" would cause the crane to collapse. His alleged fear of losing his job if he did not make the lift does not absolve him of blame. Bill Greer, as foreman, should not have permitted the lift. Don Gray was negligent in instructing Morrison to make the lift after being informed of the danger. The combined negligence of these individuals clearly was the direct, proximate cause of the damage done to the partially erected incinerator. Therefore, unless there were facts which would insulate them from liability, their respective employers, George W. Greer and Steelcraft, are responsible for any damages proved under the doctrine of *respondeat superior*. La.Civ.Code art. 2320. So is National under its policy issued to Greer.

We already have mentioned that one of the theories being asserted by Greer, National, and Steelcraft to escape liability is the "borrowed servant" or em-

ployee *pro hac vice* doctrine. They all contend Gray was Vancouver's borrowed servant; Steelcraft also asserts that the members of Greer's crew were Vancouver's borrowed servants; on the other hand, Greer's attorney contends that Greer's employees were Steelcraft's borrowed servants. To determine whether any of these claims are valid, we first must direct our attention in this diversity action to Louisiana jurisprudence concerning the borrowed servant defenses.

The seminal Louisiana decision as to the borrowed servant thesis is Benoit v. Hunt Tool Co., 219 La. 380, 53 So.2d 137 (1951). There the Louisiana Supreme Court said:

"  . . . In determining liability under this doctrine in some cases the courts have imposed liability on the person in whose business the employee was engaged at the time the tort was committed. In others the test has been the right to control over the servant at the time the tort was committed. It has been pointed out that in applying the latter test it is often difficult to decide just what fact or facts constitute control. Mere division of control does not, in itself, raise the presumption of surrender of control, but there is a presumption that the general employer is liable, and it rests upon him to show that, as to the particular work in question, the servant has been lent and is performing only the borrower's work, and that he was not the defendant's servant at all. It has been said that even the control test is not an infallible one, and that the elements of each case must be taken into consideration. Where, however, it is clear that control by the defendant was coupled with performance for the defendant and in the defendant's business, the result is certain.

"Some courts follow the so called 'whose business' test; others the 'control' test. According to the Supreme Court of the United States these two tests are really one and the same, and determining who controls the servant is merely a means of determining in whose business the servant is engaged. The Standard Oil Company v. Anderson, 212 U.S. 215, 29 S.Ct. 252, 53 L.Ed. 480; Denton v. Yazoo & Mississippi Valley Railroad Co. et al., 284 U.S. 305, 52 S.Ct. 141, 76 L.Ed. 310; . . ." At p. 140.

In quoting from *Anderson*, the Court emphasized the following:

"  ' . . . *To determine whether a given case falls within the one class or the other we must inquire whose is the work being performed,—a question which is usually answered by ascertaining who has the power to control and direct the servants in the performance of their work. Here we must carefully distinguish between authoritative direction and control, and mere suggestion as to details or the necessary cooperation, where the work furnished is part of a larger undertaking.'* (Italics ours.)" At p. 141.

Since *Benoit*, there have been a number of Louisiana decisions holding that an employee was a borrowed servant;[2] there also have been a number of cases reaching the opposite legal conclusion.[3]

2. Humphreys v. Marquette Casualty Co., 235 La. 355, 103 So.2d 895 (1958) ; Kirkland v. Western Electric Co., Inc., 296 So.2d 350 (La.App. 4 Cir., 1974) ; Hislop Plumbing Co., Inc. v. Pogue-Atkins, Inc., 283 So.2d 808 (La.App. 2 Cir., 1973) ; Richardson v. Tate, 269 So.2d 278 (La.App. 4 Cir., 1972) ; Brown v. B & G Crane Service, Inc., 194 So.2d 746 (La.App. 4 Cir., 1966) ; American Employers Insurance Co. v. Emile M. Babst Co., 181 So.2d 250 (La.App. 4 Cir., 1965) ; Truitt v. B & G Crane Service, Inc., 165 So.2d 874 (La.App. 4 Cir., 1964) ; Hebert v. Hartford Accident & Indemnity Co., 140 So. 2d 755 (La.App. 3 Cir., 1962).

3. Kiff v. Travelers Insurance Company, 402 F.2d 129 (5 Cir., 1969) ; Jurisich v. Louisiana Southern Oil & Gas Company, 284 So.2d 173 (La.App. 4 Cir., 1973) ; Barrois v. Service Drayage Company, 250 So.2d 135 (La. App. 4 Cir., 1971) ; Universal Engineers & Builders, Inc. v. Lafayette Steel Erector Corp., 235 So.2d 612 (La.App. 3 Cir., 1970) ; Kezerle v. Hardware Mutual Casualty Company, 198 So.2d 119 (La.App. 3 Cir., 1967) ;

Our analysis of the facts in each of the cited cases convinces us that it is not possible to reconcile the results reached. Thus, our holding primarily will be based upon analysis and application of the particular facts of this controversy to the Louisiana law.

As already noted, Vancouver entered into separate agreements with Bullard, Steelcraft, and Greer for design and construction of a new dry refuse burner upon the premises of its plywood plant. This project was required because Vancouver's old incinerator no longer could be used to dispose of dry waste. Steelcraft furnished prefabricated parts and a "working supervisor"; Greer provided the erection crew, motor crane and operator, and a foreman, Norman D. "Bill" Greer; Bullard was retained as consulting engineer.

Bullard's responsibility primarily was in seeing that the burner was completed timely. Although he usually visited the construction site on a daily basis and approved the erection crew's time sheets presented to him by Bill Greer, he was not involved in the day-to-day details of the construction operation. His checking of time sheets was consistent with his responsibility as project engineer; it was his method of confirming that a sufficient number of steelworkers were on the job each day, working sufficiently to complete the project on schedule.

Don Gray, Steelcraft's "working supervisor," primarily was responsible for giving instructions as to proper assembly of the refuse burner. No detailed erection manual was provided by Steelcraft; in fact, Gray was the only person at the job site who knew how the pieces of the burner should fit together. He was referred to by Bullard as a "walking erection manual." Moreover, although he involved himself in details of the construction, such as instructing Greer's crew to put up two panels at a time instead of a single panel, the latter were not bound to follow his instruc-

tions in this respect. He had no authority to dismiss them or to hire additional steel workers.

Bill Greer was the foreman of George Greer's erection crew. He kept records of the time they worked, told them when to come to work, where to work, when to break for lunch, and saw to it that they received their pay checks from George Greer. He submitted time sheets to Bullard for approval and assumed other responsibilities for which George Greer paid him additional compensation. Although Bill Greer was foreman of the Greer crew, it was necessary for him to work closely with Don Gray in assembling the burner and to follow Gray's instructions as to how the burner's parts should be put together.

Neither Gray nor Greer's crew were paid by Vancouver. Instead, the latter paid their general employers according to contract. Then, Steelcraft and Greer paid salaries or wages directly to Gray and the crew members, respectively.

The degree of control exercised by Vancouver over Gray and by both of them over Greer's crew is difficult to ascertain from the evidence, thereby rendering the question of whether Gray and/or Greer's crew were "borrowed servants" a close one. Notwithstanding, we are of the firm opinion that the burden of overcoming the presumption that an employee remains the servant of his general employer has not been met. The facts merely show "necessary cooperation among the parties," with Gray and the members of Greer's crew remaining under "authoritative direction and control" of their respective general employers. Consequently, their negligence may be imputed only to the two general employers, Steelcraft and George W. Greer.

Steelcraft further contends it is shielded from liability by the indemnity clause contained in its contract with Vancouver. The purchase order between Steelcraft and Vancouver provided in part: "Purchaser accepts responsibility

Blunt v. Lunsford, 126 So.2d 379 (La.App. 2 Cir., 1960); Thompson v. National Surety Corp., 124 So.2d 227 (La.App. 2 Cir., 1960);

Fontenot v. National Transfer Company, 99 So.2d 795 (La.App. 1 Cir., 1957).

*for all loss occurring during erection including, but not limited to, fire, windstorm, tornado and earthquake."* Steelcraft argues that, by this "indemnity" clause, Vancouver assumed all responsibility for any damages occurring during erection of the incinerator. Vancouver contends that the clause did not insulate Steelcraft from liability for damages caused by the negligence of a Steelcraft employee.

■ Louisiana jurisprudence holds that "[a]n indemnity or hold harmless clause exempting one from liability based on his own negligence must be expressly stated and clearly stipulated." Jayco Sales & Service, Inc. v. Smith, 303 So.2d 554, 556–557 (La.App. 1 Cir., 1974). Which is to say that the intention to hold an indemnitee harmless for damages *caused by his own negligent acts* must be expressed in unequivocal terms; otherwise, the indemnitee will not be granted such extraordinary protection. Cole v. Chevron Chemical Co.-Oronite Division, 477 F.2d 361 (5 Cir., 1973); Gorsalitz v. Olin-Mathieson Chemical Corp., 429 F.2d 1033 (5 Cir., 1970); Grigsby v. Coastal Marine Service of Texas, Inc., 412 F.2d 1011 (5 Cir., 1969); Mills v. Fidelity & Casualty Co. of New York, 226 F.Supp. 786 (W.D.La., 1964); Jurisich v. Louisiana Southern Oil & Gas Co., 284 So.2d 173 (La.App. 4 Cir., 1973); Strickland v. Nutt, 264 So. 2d 317 (La.App. 1 Cir., 1972); Elephant, Inc. v. Hartford Accident & Indemnity Co., 239 So.2d 692 (La.App. 1 Cir., 1972); Arnold v. Stupp Corp., 205 So.2d 797 (La.App. 1 Cir., 1967); Jennings v. Ralston-Purina Co., 201 So.2d 168 (La.App. 2 Cir., 1967). This rule has been applied not only where the indemnitee's negligence is the sole legal cause of damages but also where his negligence combines with that of another to produce the damage. *Cole, supra; Strickland, supra.*

■ At trial, Bullard testified he was aware of the clause in Steelcraft's con-

tract wherein the latter's working supervisor "would accept no responsibility"; thus Steelcraft contends that this testimony shows that Vancouver intended to indemnify Steelcraft for any loss, even where the negligence of the latter's employee(s) was a legal cause of that loss. Nevertheless, we firmly are convinced that Bullard's testimony does not provide proof of the "unequivocal intent" required to provide Steelcraft with indemnity from damages caused by its own negligence, i. e., the negligence of its employee(s).

■ Steelcraft points to *Elephant, Inc.,* and *Jennings* to show that it is not necessary for an indemnity clause expressly to provide that the indemnitee would be held harmless for damages caused by his own negligence. While it is true that in neither of these cases did the indemnity clause in question use the term "negligence," in both the Court found that the parties' intent to indemnify the indemnitee from liability for his own negligent acts was clear. We find that not to be the case here. Accordingly, we hold that the "indemnity" clause in question did not relieve Steelcraft from liability for damages caused by the negligence of its employee, Don Gray.

■ Steelcraft further contends that in light of the "Guarantee" clause in its contract with Vancouver [4] it cannot be held responsible for any consequential damages. Alcoa Steamship Co. v. Charles Ferran & Co., 443 F.2d 250 (5 Cir., 1971), is cited in support of this argument. Yet, no meaningful explanation was provided, nor can we discern any, as to how *Alcoa* applies to the circumstances here.

Having found that, under the facts here presented, there were no "borrowed servants" and that the provisions of Steelcraft's contract with Vancouver did not insulate it from liability, we hold that defendants Greer and Steelcraft are solidarily liable for any damages suf-

---

4. The "Guarantee" clause provided in part: "There are no warranties by the seller except those expressly stipulated. In no event shall the seller be liable for consequential damages."

fered by Vancouver. National, as Greer's liability insurer, is solidarily liable with Greer for any sum the latter is required to pay to Vancouver. We now turn our attention to the issue of damages.

The parties have stipulated that Vancouver incurred damages totalling $12,959.70 for repair parts and additional labor and crane rental necessitated by the accident. But Vancouver claims it also incurred other damages as follows:

| | | |
|---|---|---:|
| 1) | Additional fees paid to consulting engineer; construction supervision and administrative costs due to repair time, caused by the accident | $ 2,629.37 |
| 2) | Loading and hauling costs which would not have been incurred if the incinerator had been completed on schedule | 5,762.00 |
| 3) | Additional pay to Steelcraft for Don Gray's services during repair time | 836.37 |
| | Total | $ 9,227.74 |

■■ In order to recover these disputed damages, Vancouver must have proved each element by a preponderance of the evidence. Saulter v. Cousin, 294 So.2d 251 (La.App. 1 Cir., 1974); Davis v. Trans-America Insurance Co., 289 So. 2d 862 (La.App. 4 Cir., 1974); Jones v. Rodgers, 179 So.2d 674 (La.App. 2 Cir., 1965). Even where it is apparent that a plaintiff has suffered some loss, we cannot award damages in the absence of definite proof. We cannot engage in conjecture or speculation so as to " . . . conjure up some fictitious amount to award a claimant on the basis that he should be entitled to something when the claimant had the full opportunity to prove such loss to the court and simply failed to do so." *Saulter, supra,* 294 So.2d at p. 253.

■ At trial, Vancouver's vice-president of finance and administration, A. F. McCurdy, Jr., testified as to the unstipulated losses Vancouver claims to have suffered. Yet, his figures admittedly were based upon uncertain estimates, "horseback judgments," and cost-accounting allocations which were not actual losses to the Company. Thus, while we feel reasonably certain that Vancouver did suffer some actual additional losses beyond those stipulated, we hold that it has failed to carry its burden of proof in establishing these. Any award we might make necessarily would be based substantially upon speculation and conjecture. Consequently, Vancouver's demand for damages over and above the amount stipulated must be denied. Moreover, Vancouver's demand for penalties and attorney's fees as against National also must be denied.

■ We now turn to George W. Greer's counterclaim against Vancouver for the $5,872.80, admittedly owed to Greer but withheld by Vancouver to assure recovery for its damages. Greer clearly is entitled to recover this sum plus legal interest from date of judicial demand until paid.

■ Greer also cross-claimed against National for reasonable attorney's fees and expenses incurred in defense of this case by his private attorney. Greer was forced to retain his own counsel when National refused to provide him with a defense, claiming there was no coverage under his policy of insurance. National did not discuss this issue in its post-trial or rebuttal briefs, both of which were styled as "Brief on Behalf of National Automobile Insurance Company and George W. Greer. . . ." National clearly, albeit most belatedly, abandoned its claim that it owed Greer no defense. This breach of duty as Greer's insurer entitles him to recover all expenses incurred by him in defense of this action, including reasonable attorney's fees. Bandy v. Avondale Shipyards, Inc., 458 F.2d 900 (5 Cir., 1972); American Home Assurance Co. v. Czarniecki, 255 La. 251, 230 So.2d 253 (1969).

Greer's attorney incurred expenses totalling $322.36; adding to this figure Greer's attorney's fees, at the rate of $35.00 per hour for out-of-court time, and $50.00 per hour in court, Greer claims he is entitled to recover $3,713.36 from National. Given the expertise and

experience of Greer's private counsel, we find that the charge for attorney's fees is reasonable under the circumstances. Thus Greer is entitled to judgment against National for this amount, plus interest from date of judicial demand until paid.

To summarize, we make the following awards:

1) Steelcraft and George W. Greer and Greer's insurer, National, are solidarily liable to Vancouver for damages in the amount of $12,959.-70, plus legal interest from date of judicial demand until paid.

2) George W. Greer is entitled to recover from Vancouver $5,872.80, plus legal interest from date of judicial demand until paid.

3) National is indebted to Greer in the sum of $3,713.36, plus legal interest from date of judicial demand until paid, for legal expenses incurred by Greer.

A proper decree in accordance with these rulings should be presented by counsel for Vancouver, after approval as to form by counsel for all other parties, within fifteen days from this date.