201 So.2d 168 (1967)
Clyde Ray JENNINGS, Plaintiff-Appellant,
v.
RALSTON PURINA COMPANY et al., and Aetna Insurance Company et al., Defendants-Appellants.
No. 10838.
Court of Appeal of Louisiana, Second Circuit.
June 30, 1967.
Rehearing Denied July 27, 1967.
*170 Johnston & Johnston, Shreveport, J. B. Dawkins, Monroe, for appellant Clyde Ray Jennings.
Mayer & Smith, Shreveport, for appellant Ralston Purina Co. and Liberty Mutual Insurance Co.
Lunn, Irion, Switzer, Johnson & Salley, Shreveport, for appellants Aetna Insurance Co. and Wayne Efurd.
Before HARDY, GLADNEY and AYRES, JJ.
HARDY, Judge.
This is an action ex delicto for damages for personal injuries sustained by plaintiff allegedly resulting from the negligence of defendant, Ralston Purina Company, with whom its insurer, Liberty Mutual Insurance Company, was joined as a co-defendant. Wayne Efurd, plaintiff's employer, d/b/a Acme Steel Buildings (or Builders), and his workmen's compensation insurance carrier, Aetna Insurance Company, intervened, seeking reimbursement for compensation payments and medical expenses made to and for the benefit of plaintiff. In answer to plaintiff's petition Ralston and Liberty Mutual assumed the position of third party plaintiffs and impleaded Efurd and Aetna as third party defendants. After trial there was judgment rejecting plaintiff's demands, from which judgment plaintiff, third party plaintiffs and third party defendants have all appealed.
The material facts may be briefly stated. Ralston Purina Company owns and operates a feed mill in the City of Shreveport and its operations are conducted in an extensive plant, part of the main portion of which rises to a height of eleven stories. On the west side of the plant a one-story loading shed covered by a slanted roof, made of a composition material known as Transite, extended for a distance of approximately 100 feet north and south. Under an agreement dated March 20, 1964, Ralston entered into a contract with Acme Steel Buildings for the construction of both north and south extensions to the loading shed. At about 11:00 o'clock, A.M. on June 13, 1964, plaintiff, Clyde Ray Jennings, a roofer employed by Efurd, while working on the shed roof slipped and fell to the ground, sustaining serious and disabling injuries.
Plaintiff's claim against Ralston and its insurer is based upon the contention that his accident was caused by the negligence of employees of Ralston. Immediately prior to the occurrence of the accident plaintiff and his brother, Grady Jennings, who was foreman of the Efurd construction crew, were engaged in caulking joints where new pieces of Transite had been laid upon the 22 foot extension of the south end of the shed. This work being near completion plaintiff started to walk from the *171 south extension across the old section of the shed roof for the purpose of beginning work on the north extension, and en route he slipped and fell, sliding off of the roof and plunging to the ground. There appears to be no argument as to the cause of plaintiff's fall, that is, that he slipped on the wet Transite which, it is conceded, becomes exceedingly slippery and dangerous when wet. About 8:00 o'clock on the morning of the accident Ralston's plant superintendent, Albert Woods, assisted by an employee, Charles Thames, began the operation of washing down the upper portions of the plant walls, using a stream of water from a 1½ inch fire hose. The washing operations were begun on the upper floors of the east side of the plant, after which Woods moved around to the north side of the upper floors. At or about the time of the accident Woods was standing on a ladder on the west side of a portion of the building directing the stream of water against the walls of the upper floors on the north side. The water from this hosing operation fell down the north wall to a roof at the seventh floor level where it drained down the west side of the building and onto the shed roof from which it flowed onto the ground.
The basis of plaintiff's claim against Ralston is that its employees were negligent in the conduct of the washing operations, particularly in view of their knowledge that the water drained down onto the shed roof where plaintiff was working and created a hazardous condition. As a further element of negligence plaintiff contends that under the conditions resulting from these washing operations Ralston's employees should have warned him of the danger.
Although denying any negligence by its employees, Ralston principally relies upon the defenses of contributory negligence and assumption of risk by plaintiff. These defenses are based upon the contentions that plaintiff's brother, who was acting foreman, was warned of the presence of the water by Woods, the plant superintendent; that another employee, Pettaway, had called out the warning to two men (plaintiff and his brother) whom he saw working on the roof; that plaintiff ignored the warning, and further, that he saw or should have seen the water and realized the slippery condition of the roof.
The principal issue presented is factual, namely, whether the record supports the finding of the trial judge that defendants, Ralston and its insurer, established the defenses of contributory negligence and assumption of risk by plaintiff.
The claim asserted by Efurd and Aetna as intervenors presents no difficulty. In the event of recovery by plaintiff these parties are clearly entitled to reimbursement of compensation and medical expenses out of such judgment under the provisions of LRS 23:1101.
The third party claim of Ralston and its insurer is predicated upon the contract between Ralston and Efurd containing provisions for indemnification of Ralston against liability arising out of the performance of the contract.
We first address ourselves to the issues of negligence and contributory negligence which are purely factual. We are in agreement with the district judge on the irreconcilable conflict of testimony of the witnesses for plaintiff and defendant, Ralston. There can be no question as to the dangerous conditions which were the direct result of the washing operations undertaken by Ralston's employees which required that adequate warning of the nature of the danger be transmitted to the employees of Efurd who would be placed in a position of danger. It is apparent that this obligation was recognized by counsel for the parties litigant and as a consequence the major portion of the argument on behalf of both plaintiff and defendants is devoted to the issue as to whether warning was given.
The defenses at issue are affirmative, and, therefore, it was the obligation of defendants to establish them by a preponderance of the evidence.
*172 On behalf of defendant, Ralston's plant superintendent Woods and the employee Pettaway testified as to giving warnings. Pettaway testified that immediately after reporting for work he turned on the water at the ground level which would supply the fire hose to be used for the washing operation; that shortly after this he saw the water on the roof and made his way to a third-story window overlooking the shed roof where he saw two persons, whom he was unable to identify but who must have been plaintiff and his brother, working at the south end of the roof; that he "hollered" to the men, warning them that the roof would be slick where it was wet from the drainage of water; that he heard one of the men ask the other what had been said and heard his warning repeated in answer to the question. We find the testimony of this witness to be most unsatisfactory and unconvincing. It is evident that he was confused as to the time element and that the warning to which he testified could not have been given within a few minutes after he turned on the water. The witness further testified that the men he saw on the roof were south of some large pipes described as "cyclones", and that he saw them working between these pipes; that although he "hollered" his warning he could clearly hear the question and answer as between the two men which were spoken in a conversational tone of voice. Even making allowance for a considerable margin of error as to the time factor, we have serious doubt as to the testimony of this witness.
The only other witness who testified as to a warning was the superintendent Woods. According to his testimony he first warned Grady Jennings before or about 8:00 o'clock, A.M. The testimony of this witness does not indicate any warning of danger and his testimony on first cross-examination on the opening of the trial was as follows:
"Well, I explained to him that we were going to do a certain amount of washing on the upper floors that morning, and if we disturbed them in any way let us know, we would stop, move, whichever was necessary."
Subsequently, in this first cross-examination, the witness indicated his uncertainty as to whether he had told Grady Jennings that there would be any water and he did not indicate that there would be any degree of danger in connection with the work he and other Ralston employees intended to do.
Later in the trial, as a witness for defendants, Woods testified that he had met Grady Jennings on the ground level during a work break at about 9:30 A.M. The witness testified in considerable detail as to this conversation, particularly with respect to the water which would make the roof "* * * extremely dangerous and slick, and somebody could possibly fall off the roof."
As opposed to the testimony of defendants' witnesses, both plaintiff and Grady Jennings positively denied having received any warning of any nature from any person. Additionally, Grady Jennings testified that after beginning work on the shed roof at about 8:00 o'clock he did not at any time descend to the ground level until immediately after the occurrence of the accident. To some degree this testimony was corroborated by another member of the Efurd construction crew, Homer Burns, a brother-in-law of the Jennings parties, who testified that he was working under the shed roof immediately below the area where Clyde and Grady Jennings were occupied and that neither of them left the roof between the time they began work and the time of the accident.
We are keenly aware of the burden upon appellate courts which requires that a high degree of consideration be given to the factual findings of a trial judge, and we have no desire nor intent in this, or any other case, to disregard such findings. However, we are impressed by a number of observations in the reasons given by our respected brother of the district court which were dictated into the record upon the conclusion *173 of trial and the effect of these statements impels us to the conclusion that our brother was disturbed by the lack of a definite basis for certainty and positive evaluation of the evidence which had been adduced. For example, the opinion of the district judge notes that the witness, Pettaway, was obviously confused; that the evidence in the case was in irreconcilable conflict and that the excitement of the accident must have blotted out the memory of certain occurrences, despite which the Judge concluded that there was no attempt by the parties to fabricate a case or falsify their testimony.
Certainly the testimony is contradictory and the confusion as to certain pertinent facts is obvious, but under such circumstances we think it was error to find that defendants, Ralston and Liberty Mutual established their affirmative defenses by the preponderance of the evidence required by our jurisprudence. Foggin v. General Guaranty Insurance Co. (1967), 250 La. 347, 195 So.2d 636; Stansbury v. Mayor and Councilmen of Morgan City (1955), 228 La. 880, 84 So.2d 445, and cases therein cited. In the somewhat recent case of Finn v. Employers Liability Assurance Corp. (2nd Cir., 1962, writs denied), 141 So.2d 852, the opinion of this Court specifically set forth the principles applicable to the defenses of contributory negligence and assumption of risk as follows:
"The applicable rules are that, where the defense relied on is the assumption by the employee of the risk to which he was subjected, it must appear with reasonable certainty either that he was specifically informed of such risk or it was so obvious that it could not have escaped his attention. Nor can an employee be understood as contracting to take upon himself risks which he neither knows, nor suspects, nor has reason to look for; rather, it would appear more reasonable to imply a contract on the part of the master not to invite the servant into unknown dangers than for the servant to run the risk of them." (Cases cited)
There is no eye-witness testimony as to the amount of water that was flowing down the shed roof at the time the accident occurred. None of defendants' witnesses observed nor had any knowledge of the accident until after its occurrence. The testimony of plaintiff's witness, Burns, was that he heard water dripping off of the shed roof immediately prior to plaintiff's fall. This witness was the first to reach plaintiff and he testified that he helped move the injured man to a position away from the edge of the roof in order to keep him from getting wet. After his brother had been taken to the hospital Grady Jennings returned to the roof, and, according to his testimony, observed some damp spots in or about the area where he assumed his brother had slipped. However, there is no definite testimony that there was any noticeable volume of water crossing over the shed roof which would have been sufficient in itself to constitute a warning of danger to plaintiff. The conclusion of contributory negligence based upon this factor would have to rest upon a strained deduction from some relatively slight circumstantial evidence. We cannot reach a conclusion that plaintiff was guilty of contributory negligence based upon unsubstantial facts. Such a conclusion would be speculative and entirely without reliable support.
With the conclusion of the trial judge we cannot agree, and our repeated examination of the testimony reflected by the record convinces us that the defendants have failed to discharge the burden imposed upon them. They have not established the giving of any effective warning, nor any acts of contributory negligence or assumption of risk. It necessarily follows that the judgment must be set aside and rendered in favor of plaintiff.
The third party demand by Ralston and Liberty Mutual against Efurd and Aetna is founded upon the provisions of a written *174 contract executed by the parties under date of March 20, 1964, which agreement contains specifications of the obligations of indemnity and insurance assumed by the contractor, which we set forth, in extenso, as follows:
"SECTION 4. INDEMNITY AND INSURANCE.

Contractor shall protect, indemnify and hold harmless Company from any loss, damage, liability and expense for all injuries, including death to persons or damage to property directly or indirectly arising or growing out of the performance of this Contract except loss or damage that is recoverable under Company's fire and extended coverage insurance. Contractor shall hold Company harmless from and shall answer and defend any action instituted against Company for any loss, damage or injury sustained by any person resulting from the performance of this Contract.
"Contractor shall carry and maintain such liability insurance as will protect Contractor and Company from claims under any workmen's compensation acts and from any other damages from personal injury, including death, which may be sustained by Contractor's workmen, sub-contractors or any of their servants, agents or employees and the general public, and from claims for property damage which may be sustained by any of them, due to the performance of this Contract. Contractor shall furnish the Company certificates that Contractor has in effect the following insurance.
(a). Workmen's Compensation Insurance plus Occupational Disease Insurance, if separate Occupational Disease Coverage is needed in the State of Louisiana.
(b). Comprehensive General Liability Insurance with limits of $100,000/$300,000 personal injury and $25,000 property damage limits with elevator, hoist, tunneling, excavation, demolition and blast endorsements attached.
(c). Automobile Liability Insurance with $100,000/$300,000 personal injury and $25,000 property damage limits.
Contractor shall furnish Company with proof that his insurer acknowledges the contractual liability assumed by Contractor in this Contract."
The record also contains the certificate of insurance issued by Aetna Insurance Company directed to Ralston which specified the nature of the insurance issued by Aetna to Efurd, as the insured, effective April 1, 1964. There can be no question as to the conclusions that this certificate was furnished in satisfaction of the requirement of the last paragraph of the contractual provision above noted and that it evidenced the existence of insurance coverage for the exact risks and in the exact amounts required by the contract.
Third party defendants, Efurd and Aetna, urge certain specific grounds of defense against the third party claim of Ralston and Liberty Mutual, which we now undertake to consider, seriatim.
Third party defendants contend that suit by the tort feasor against the employers is prohibited by the provisions of LRS 23:1032 limiting the right of recovery by the employee to an action for workmen's compensation, and in support of this position cite a number of cases of Federal as well as Louisiana jurisprudence. First, it is important to note that this is not a suit by an employee against his employer and his compensation insurer. By this action plaintiff has sued a third party in tort and his right to such action cannot be contested on any ground. The third party action, on the contrary, is not a tort proceeding nor is plaintiff a party thereto, but it stems from a contractual relationship between the alleged tort feasor and its contractor. Plaintiff has no connection with nor interest in this suit. We do not find it necessary to *175 discuss the authorities cited by counsel for third party defendants on this point, which we consider to be inapplicable in any respect with one possible exception. The cited case of Sanderson v. Binnings Construction Co. (4th Cir., 1965), 172 So.2d 721, is authority for the conclusion that an employer has no obligation, in solido, with the tort feasor, and, therefore, cannot be held liable either for indemnity or contribution. However, this is not the issue that is presented in the matter before us and the Binnings case is completely inapplicable because it involved no agreement in any respect similar to that relied upon in the instant case.
Counsel for third party defendants also urgently contends that a contract of indemnity whereby one assumes indemnification against his own negligence must be strictly construed. We have no quarrel with this principle. However, it matters not how strictly we construe the indemnity provision of the contract against Ralston as contractee nor how liberally we might construe the provision in favor of Efurd, the contractor, we cannot conceive of any conclusion which would detract from the clearly quoted, specifically stated and thoroughly comprehensive obligation on the part of Efurd to indemnify Ralston against any damage or injury arising out of the performance of the contract whether or not such damage resulted from Ralston's negligence.
Finally, it is urged that a contractual stipulation providing indemnity against the negligent acts of the contractee is void as being contrary to public policy and in support of this contention counsel cites the case of Sandel & Lastrapes v. City of Shreveport (2nd Cir., 1961, writs denied), 129 So.2d 620.
The cited case is inappropriate. The principle enunciated in the opinion of the Court was pertinent only under the facts of that case with reference to the relationship of the parties involved (contractor and contractee) and did not involve protection against tort liability to third persons.
We find no possible violation of public policy in the application of the indemnity agreement in the instant case. To hold that a party cannot protect itself through indemnification or insurance against liability for its own negligent acts would not only do violence to well established authority to the contrary but would strip vast numbers of the protection accorded by such contracts. For example, such a holding would have the effect of denying the highly necessary insurance protection accorded in automobile liability insurance policies, which have for one, if not the most important, purpose the protection of the insured against the effects of his own negligence.
The only remaining question as between the third party litigants relates to Ralston's contention that it is entitled to recovery of attorney's fees incurred in its defense of plaintiff's suit from Aetna which refused to accept responsibility for such defense. By stipulation of counsel it was agreed that the fixing of the amount of the attorney's fees should be left to the discretion of the court provided it should not, in any event, exceed the sum of $2,500.00.
The indemnity provision of the contract between Ralston and Acme provides for protection against "* * * any loss, damage, liability and expense * * *." Under this provision, as well as the provisions of the insurance policy issued in consequence thereof, we think that reasonable attorney's fees constitute an expense for which Efurd and Aetna should be liable in view of their failure or refusal to defend this suit. In our opinion this fee should be fixed in the amount of $2,000.00.
Finally, it is necessary to fix the amount of damages to which we think plaintiff is entitled by reason of the injuries sustained.
From the nature of the injuries it appears that plaintiff, in falling from the shed roof to the ground below landed on his feet and the violent shock resulted in serious and disabling injuries to these members. *176 Immediately following the accident plaintiff's feet and ankles became swollen to approximately twice their normal size. Plaintiff was examined by Dr. Bicknell, the orthopedic surgeon of Shreveport, on the afternoon of June 13, 1964, at which time he was suffering considerable pain. X-ray examinations disclosed comminuted fractures of both os calcis. Plaintiff's injuries were treated for the purpose of reducing inflammation and swelling and relieving his pain to such extent as possible before undertaking operative repairs. The first operation was performed on June 30th on the left foot and the second operation on July 9th on the right foot. The operations were essentially the same. An incision was made in the heel area, some fragments of bone were removed, others were molded back into shape and fused in the substragular joint area, and a portion of bone removed from the hip was fused with the heel bone. Plaintiff was discharged from the hospital on August 1st after which he was a bed patient at home for a period of time and progressed by stages to an ambulatory condition, first in a wheelchair and then upon crutches over a period of some five or six months before he was able to undertake walking without these aids.
After plaintiff's discharge from the hospital he returned to his home in Monroe where he was kept under constant treatment by Dr. Cline, an orthopedic surgeon to whom he had been referred by Dr. Bicknell. Dr. Cline testified by deposition that as the result of his injuries and the performance of the necessary operations plaintiff had permanently lost the sub-talor flexion or movement of the heels, and, additionally, had suffered a practically complete loss of dorsi-flexion. Translated into laymen's language this means that plaintiff can no longer move his heels from side to side nor raise his toes. In other words, he has lost two of the three movements of each foot. According to the medical testimony plaintiff is disabled from walking over uneven or slanting surfaces, of maintaining his balance of standing or walking for sustained periods, and of weight lifting. There can be no question as to the fact that this nature of disability will effectively prevent plaintiff from engaging in the occupations he had performed prior to his injury, namely those of a glasscutter, a pipeliner and a roofer.
Although plaintiff is permanently disabled from resuming any of his former occupations, he is not completely disabled with respect to the performance of manual labor, for example, he is able to drive an automobile or truck and there is testimony in the record which justifies not only the hope but the belief that through participation in vocational rehabilitation and educational programs plaintiff will be able to fit himself for gainful employment.
Unquestionably, plaintiff suffered severe pain over a considerable period of time and as of the date of trial, more than 2½ years after the accident, he was still almost completely disabled. At the time of the accident plaintiff was 28 years of age, had received an eighth grade education and was earning slightly less than $4.00 per hour for a forty hour week in his employment as a construction worker or roofer.
With reference to quantum our attention has been called to the very recent case of Kezerle v. Hardware Mutual Casualty Co. (3rd Cir., 1967), 198 So.2d 119, in which the injuries suffered by the plaintiff were in many respects remarkably similar to those involved in the case before us. Our brethren of the Third Circuit affirmed an award of $35,000.00 made by the district judge for pain and suffering, and, in addition, amended the judgment by awarding a like sum of $35,000.00 for loss of future wages.
While we have frequently observed that the quantum of damages must be determined upon the basis of the facts involved in each particular case, we do concede that cases which concern a comparable nature, degree and extent of injury are entitled to consideration for the sake of preservation *177 of some reasonable uniformity of awards insofar as such a result may be possible.
We do not think that plaintiff in this case suffered as serious a degree of pain over as long a period of time as that which was involved in the Kezerle case, and, in our opinion, we think an award of $20,000.00 would be adequate compensation for pain and suffering.
Plaintiff's petition prayed for damages for loss of earnings, past, present and future, during his entire life expectancy in excess of $300,000.00, but it is noted that counsel for plaintiff in brief before this court, with commendable propriety, has suggested an allowance of $75,000.00 with reference to this item.
After thorough consideration we have reached the conclusion that an allowance of $35,000.00 for loss of wages, past, present and future, will represent a reasonable award under the circumstances.
Plaintiff further seeks the recovery of stipulated medical expenses of $2,520.65, to which he is clearly entitled.
For the reasons assigned the judgment appealed from is annulled, set aside and reversed, and,
It is ordered, adjudged and decreed that there be judgment in favor of plaintiff, Clyde Ray Jennings, and against Ralston Purina Company and Liberty Mutual Insurance Company, in solido, in the full sum of $57,520.65, with interest thereon at the legal rate from date of judicial demand until paid.
It is further ordered, adjudged and decreed that there be judgment in favor of Ralston Purina Company and the Liberty Mutual Insurance Company and against Wayne Efurd, d/b/a Acme Steel Buildings, and Aetna Insurance Company, in solido, in the full sum of $57,520.65, together with such amount of interest as Ralston Purina Company and Liberty Mutual Insurance Company may be due plaintiff, and together with further judgment in the sum of $2,000.00 as attorney's fees.
It is further ordered, adjudged and decreed that there be judgment in favor of intervenors, Wayne Efurd, d/b/a Acme Steel Buildings, and Aetna Insurance Company to the extent of all compensation payments and medical expenses made to and for the benefit of Clyde Ray Jennings, together with accrued interest thereon, which judgment, by reason of the nature of the principal judgments above noted, is ordered to be satisfied by the credit of said amounts against the full liability of Wayne Efurd, d/b/a Acme Steel Buildings and Aetna Insurance Company.
All costs of both courts are taxed against third party defendants, Wayne Efurd, d/b/a Acme Steel Buildings, and Aetna Insurance Company.