377 So.2d 1384 (1979)
George O. DAIGLE, III
v.
Samuel LANG, Leslie L. Inman, John M. Bee, Frederick S. Kullman, David A. Lang, Carl S. Downing, XYZ Insurance Company, New Orleans Saints, and ABC Insurance Company.
No. 10223.
Court of Appeal of Louisiana, Fourth Circuit.
December 11, 1979.
Rehearing Denied January 18, 1980.
*1385 Owen J. Bradley, New Orleans, for plaintiff-appellee.
Dodge, Friend, Wilson & Spedale, New Orleans, Gordon F. Wilson, Jr., for defendants-appellants.
*1386 Drury & Lozes, James H. Drury and Stephen M. Lozes, New Orleans, for Engineered Equipment, Inc. and Walter F. Chappell, III, third-party defendants-appellees.
Before SAMUEL, BOUTALL and BEER, JJ.
SAMUEL, Judge.
Plaintiff instituted this suit for damages for personal injuries received while dismantling a former radio tower. The defendants (hereinafter referred to as Kullman-Lang) were the members of the law firm who owned the building[1] and their respective insurers.[2] The radio tower, on which there was a lettered electrical sign advertising The New Orleans Saints, was located on the property owned by the law firm members.
Employers Commercial Union Insurance Company, the workmen's compensation insurer of plaintiff's employer, Engineered Equipment, Inc., intervened for compensation and medical expenses paid by it.
Kullman-Lang answered in the form of a general denial and filed a third party demand against Engineered Equipment, Inc., its chief executive officer, Walter F. Chappell, III, and Commercial Union, also the liability insurer of Engineered Equipment, for indemnity. In the alternative they pray for judgment against Chappell in the sum of one-half of any judgment as contribution of a joint tort feasor.
Thereafter, by supplemental and amended petition plaintiff joined Chappell, his insurer Commercial Union, and Joseph E. Viguerie, Jr., office manager of the Kullman-Lang firm, as parties defendant. Chappell and Commercial Union, then third partied Viguerie, a Kullman-Lang employee, and St. Paul Fire & Marine Insurance Company, insurer of the law firm, asking indemnity for Chappell and, alternatively one-half of any judgment rendered in favor of plaintiff, as contribution from joint tort feasors.
Prior to trial plaintiff settled his claim with defendants, Engineered Equipment, Chappell and Commercial Union (the jurors were not informed of this fact), and the suit, with the exception of the third party defendant, was dismissed with prejudice against those parties, reserving plaintiff's rights against the other defendants and their insurers.
The matter was tried to a jury on the merits with the trial court reserving its right to determine the matter of indemnity. Judgment was rendered in favor of plaintiff in the sum of $214,643.70,[3] reduced by one-half (because of the settlement with Chappell and Commercial Union) to the sum of $107,326.85, and there was judgment on the third party demand in favor of defendants, Engineered and Commercial Union, dismissing the claims of the third party plaintiff, Kullman-Lang, against them. Defendants, Samuel Lang, Leslie L. Inman, John M. Bee, Frederick S. Kullman, David A. Lang, Carl S. Downing and Joseph Viguerie, have suspensively and devolutively appealed therefrom.
These facts are uncontested: In 1969 appellants purchased a brownstone building at 615 Howard Avenue on Lee Circle in New Orleans adjacent to that occupied by The New Orleans Saints as administrative and ticket offices. Both buildings were originally owned by the Saints or related interests. This litigation involves the removal of a tower in a cul de sac between the buildings. When the Saints or related interests owned both buildings, the tower was used for advertising by the Saints. Lettering spelling the team's name was attached to the tower and illuminated at night by electrical wiring originating in the Saints' building. The tower was on the property owned by Kullman-Lang.
*1387 Following acquisition of the building and the property on which the tower and sign were located, Kullman-Lang requested the owners of the adjoining building to pay for use of the sign. Those owners refused and thereafter the law firm decided to shut off the electrical power to the sign. Viguerie, a Kullman-Lang employee, engaged a Mr. Migliore, an electrician, for that purpose (the law firm was renovating the building and occupying offices elsewhere in the city at the time), gave him a key to the gate leading to the cul de sac, and instructed him to turn off the power.
Electricity ran from the adjoining Saints' building to a junction box on the tower through wiring encased in a flexible metal conduit. Power to the sign letters ran from the junction box on the tower by insulated wiring not covered by a conduit. The electrician disconnected the power at the junction box and on February 13, 1970 billed the firm for this work.
Two and one-half years later the firm decided to remove the tower since it served no useful purpose. It engaged Engineered Equipment to dismantle it. A written contract was entered into (discussed infra) and the dismantling began. Plaintiff, an Engineered Equipment employee so engaged, was injured when he sawed through the conduit leading to the junction box with a hacksaw. He suffered an electrical shock and was thrown from the tower to the ground.
In this court appellants contend: (1) The jury erred in finding Kullman-Lang and Viguerie negligent; (2) the trial court comments on the evidence were prejudicial to appellants; (3) the award for pain and suffering is excessive; and (4) the trial court erred in failing to enforce the indemnity provisions of the contract.
Relative to the first contention, appellants are liable only if Mr. Viguerie, the office manager, was negligent. Testimony as to his involvement was given by Viguerie, Mr. Chappell, president of Engineered Equipment, Mr. Robert L. Rebert, that corporation's general foreman, and Mr. Henry DeFrates, president of Carrollton Lumber & Wrecking Company.
It is clear from the record, and Viguerie admits, that he knew the electricity to the sign was controlled from the Saints' building, and that Migliore had disconnected the sign only from the junction box. This information was not conveyed to Chappell or Rebert.
Viguerie and Chappell met on three occasions prior to the dismantling. The first meeting was in the presence of DeFrates, who had been offered the job originally but had declined and had recommended several other contractors, among them Engineered Equipment. The three men met for the purpose of examining the tower and discussing ways of removing it. DeFrates had no financial interest in the matter and his testimony establishes he has no recollection of the electricity ever being discussed at that meeting.
Chappell returned for a second meeting with Viguerie to view the site. He recalls the responsibility for the electricity being discussed at either the first or second meeting, and that Viguerie accepted that responsibility.
Viguerie had no recollection of electricity ever being discussed at any meeting and denies accepting such responsibility. He stated he expected the contractor to be responsible for all phases of the dismantling, including the electrical wiring.
Because he would be the general foreman on the job, Rebert accompanied Chappell on the latter's third visit to examine the tower. He had no recollection of electricity being discussed with Viguerie at that time.
It was also established that a Mr. Daniels was hired on a part-time basis by the law firm to attend to their air conditioning and heating, and that Daniels was a full-time employee of the Saints as a general maintenance man and lived in the Saints' building. He was not asked by Viguerie at any time (either in 1970 or 1972) to turn off the power in the Saints' building.
Since the jury found Chappell and Viguerie both negligent (Chappell never tested the wires to determine if they were live) it is clear it believed either that Viguerie had agreed to be responsible for shutting off the electricity, and/or that since he *1388 knew the power source was in the Saints' building, and had been shut off only at the junction box, he was negligent in not conveying that information to Engineered Equipment. Chappell also testified it is the owner's obligation, and not the obligation of the demolition contractor, to attend to shutting off the electricity. There is some evidence to the contrary and we would feel that this was an obligation of the independent contractor in this case. However, as this is a matter of credibility, we cannot say the jury committed error in finding both men negligent.
Nor do we agree with appellants' second contention. They claim the following comments by the trial judge were prejudicial to them. Viguerie was cross-examined at length on Migliore's instructions about disconnecting the electricity to the sign in 1970 and the fact that Daniels was never requested to disconnect the electricity at the source. After Viguerie explained he did not ask Daniels to do it, the court said:
"As a stupid question, did anyone think about unplugging it before having it dismantled? Did you?
A. Nobody did, no, sir.
. . . . .
Court: He [Daniels] lives in the Mecom [the Saints] Building. You didn't think of getting this thing unplugged before those guys started dismantling that thing?
A. No, Sir."
Shortly thereafter, the jury was dismissed for the day and appellants' attorney moved for a mistrial on the ground the judge had made his opinion known to the jury. The judge agreed to cease such expressions of opinion and further stated he would take care of it in his charges to the jury.
In view of the judge's specific instruction to the jury at the conclusion of the trial,[4] we do not find the questions complained of by the appellants were prejudicial to their case.
Nor can we agree with the third contention, that the award for personal injuries is excessive.
The jury award was made the judgment of the court. It granted plaintiff the sum of $214,634.70 for personal injuries, which we have itemized supra in footnote three. Appellants do not question the award for loss of wages since plaintiff was engaged in heavy laboring work and because of his operation, cannot lift over fifty pounds. Nor do they question the medical expenses, to which they stipulated. They argue only that the award of $164,250 for pain and suffering is excessive.
Testimony relative to plaintiff's injuries were given by several lay witnesses, principally plaintiff and his wife, and three medical experts, Dr. Julius Isaacson, Jr., a general surgeon, Dr. Kenneth Vogel, a neurologic surgeon, and Dr. Irving Redler, an orthopedic surgeon.
Dr. Isaacson testified: He first saw plaintiff November 9, 1973, six days after the accident with complaints of pain in his chest, headaches and backaches. He took a routine history and performed a general physical examination. The pertinent physical findings revealed tenderness in the lumbar area of his back and the right sternocleidomastoid muscle. Because electrical shock may cause heart damage, x-rays and an electrocardiogram were made. The latter was normal and the former showed no bony abnormalities but some changes in the lining of the spine compatible with muscle spasm.
The doctor concluded that as a result of this accident plaintiff sustained a cerebral concussion and muscle pain subsequent to muscle spasm. Treatment consisted of muscle relaxants and physical therapy. Plaintiff was not able to return to work. The pains were getting more severe and beginning to localize in the right leg, suggesting an injured nerve and possible herniated nucleus palposus (i. e., herniated disc). This being out of the area of the doctor's *1389 expertise, he recommended evaluation by an orthopedic or neurosurgeon and plaintiff was referred to Dr. George Battalora, Jr. Dr. Battalora recommended hospitalization.
Dr. Isaacson saw plaintiff fourteen times from January through March 9, and on March 13, plaintiff was hospitalized, since he was not responding to conservative treatment. Plaintiff remained hospitalized until his discharge on April 12, 1973. During this period a myelogram and subsequent surgery for a ruptured disc (a laminectomy) was performed on April 4, by Dr. Kenneth Vogel.
On August 21, 1973 plaintiff returned complaining of back pains and was sent to an internist because of persistent chest pains. In December, 1973 he still had back pains and was again referred to Dr. Vogel. He was seen April 4, 1974 with right leg pains. In September, 1974 when seen for something else, he still complained of his back and was advised to return to work, but do no climbing.
Dr. Isaacson advised plaintiff not to lift over 30-40-50 pounds and avoid prolonged bending, stooping and climbing. He concluded as a minimum plaintiff would have a 10 to 20% body disability. He was of the opinion plaintiff's injuries resulted from the accident in suit.
Dr. Vogel testified: He saw plaintiff on March 20, 1973 for evaluation of low back and right leg pains at the request of Dr. Isaacson at the hospital. The history taken related his problems to his accident of November 3, 1972. Neurologic examination of the back disclosed curvature probably as a result of spasm to the left side, an EMG (electrical function of the nerve test) showed S-1 distribution was malfunctioning.
It was Dr. Vogel's opinion plaintiff had a herniated lumbar disc. During his hospitalization and after the myelogram a laminectomy was proposed to remove the herniated disc and unpinch the nerve. This was performed and three nerves to the joint were also cut.
Plaintiff was seen six weeks after surgery, again on June 28, 1973, August 14, and February 7, 1974. He continued to complain of pain in the back. When seen for the last time on September 3, 1974, he related working intermittently with some pain in the low back and right buttocks.
In Dr. Vogel's opinion the herniated disc was a result of the electrical shock and plaintiff has a 10 to 15% disability of the body as a whole which is permanent. He must avoid activities requiring him to lift, push or pull more than 50 pounds or bend repeatedly.
Dr. Redler testified: He saw plaintiff on May 28, 1974 after reviewing the medical reports of the other physicians. A history was taken and an examination performed. He concluded the laminectomy was a success from his examination and seven x-rays taken at his office, and that there was no evidence of functional impairment of the back. He estimated plaintiff's residual disability as 10% of the lower back, and that he could return to his former type of work.
Plaintiff testified relative to his injuries: Before this accident he had no physical disability and looked forward to continuing his job as an iron worker. He was active in camping, horseback riding, bicycling, roller skating, swimming and hunting. His wife had not worked for two years prior to the accident because she stayed home and cared for the children. He is unable to participate in any strenuous activities since the accident and his wife has returned to work to help out with finances.
At the time of the accident two sections of the tower had been dismantled and he was in the process of taking down the third section. Before cutting the electrical line with a hacksaw, he called down to ask if the power was off, and upon being informed that it was, he cut the line. When he came to, he was lying on the ground. He was taken to the emergency room of a hospital, seen by their doctor, given a cardiogram and advised to go home and stay in bed. He attempted to return to work that Monday but was unable to do so.
Plaintiff discussed in detail his visits with various doctors, his complaints and treatment, *1390 his hospitalization, myelogram and surgery.
He is unable to return to work as an iron worker and has tried to work as a timekeeper, which involves no strenuous physical labor. He also attempted to open a muffler shop with a partner but that business failed, and he did light work for another company. He contends his personality has changed and that he is a lot harder to get along with because of his back problems.
His wife testified in a similar vein. The other lay witnesses testified as to the duties of an iron worker and that plaintiff was able to do light work while other employees covered for him.
It is clear that as a result of the accident plaintiff has a serious back condition and at least a 10% and a possible 20% permanent residual disability of the entire body which will prevent him from continuing to pursue his job as an iron worker. He was 29 years old at the time of the accident and had a work life expectancy of 27.9 additional years and a total life expectancy of 37.3 years. While it is true that the award of $164,250 for pain and suffering appears generous, we are guided by the latest expression of the Supreme Court in the case of Reck v. Stevens.[5] As stated in that opinion:
".... before a Court of Appeal can disturb an award made by a trial court that the record must clearly reveal that the trier of fact abused its discretion in making its award. Only after making the finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded that court. It is never appropriate for a court of appeal, having found that the trial court has abused its discretion, simply to decide what it considers an appropriate award on the basis of the evidence."
Since we do not find the jury clearly abused its "much discretion," we cannot substitute our own views concerning a possible lesser award.[6]
Finally, we feel compelled to hold appellants' fourth contention, that they are entitled to indemnity, also is without merit.
The contract is in the form of a proposal by Engineered Equipment which was accepted by Kullman-Lang. The hold-harmless provision and the provision immediately following read:
"The Contractor binds and obligates itself to hold the Owner harmless from any claims of any nature whatsoever for personal injury or damage to property arising out of his performance of the work herein undertaken and further agrees to be responsible for any and all damage to the Owner's property caused by or arising out of the performance of said work.
We are fully covered by Workmen's Compensation, Property Damage and Public Liability Insurance for your protection. A certificate of Insurance will be furnished before work is started, showing our limits of coverage of $100,000/500,000."
The general rule, recently expressed by the Supreme Court in Polozola v. Garlock, Inc., La., 343 So.2d 1000, 1003, is as follows:
"A contract of indemnity whereby the indemnitee is indemnified against the consequences of his own negligence is strictly construed, and such a contract will not be construed to indemnify an indemnitee against losses resulting to him through his own negligent act, unless such an intention was expressed in unequivocal terms."
Here, as found by the jury, Viguerie and, vicariously, Kullman-Lang, were guilty of concurring negligence which proximately caused plaintiff's injuries and the contract does not state indemnitee is indemnified against its own negligence.
*1391 The rule as stated in Polozola has not been literally applied. An indemnity clause need not include the magic words of negligence if the factual circumstances are such that no other conclusion reasonably can be reached except that negligence of the indemnitee was intended to be included in the indemnity agreement. For example, the case of Jennings v. Ralston Purina Company, La.App., 201 So.2d 168, on which appellants rely, contains language quite similar to our contract. The contractual provisions in Jennings were:
"Contractor shall protect, indemnify and hold harmless Company from any loss, damage, liability and expense for all injuries, including death to persons or damage to property directly or indirectly arising or growing out of the performance of this Contract except loss or damage that is recoverable under Company's fire and extended coverage insurance. Contractor shall hold Company harmless from and shall answer and defend any action instituted against Company for any loss, damage or injury sustained by any person resulting from the performance of this Contract."
The Jennings court concluded that damages resulting from Ralston's (the owner's) negligence was included in the indemnity agreement because no other interpretation was possible.
Our agreement is not so all inclusive. In Jennings indemnity is included for all injuries "arising or growing out of the performance of this Contract." (emphasis ours). Such language can be construed to mean any performance, whether it be by the owner or by the contractor. However, in our case the contractor only obligates itself to hold the owner harmless from any claims for personal injury arising out of his (the contractor's) performance of the work and thus, insofar as personal injury is concerned, limits the obligation only to the actions of the contractor itself. This difference is clearly pointed out by simply continuing the reading of that sentence in which the contractor further agrees to responsibility for damage to the owner's property arising out of the performance of the work. Thus, our contract is similar to the one in Jennings only insofar as damage to the owner's property is concerned.
Additionally, the insurance clause, which follows, offers insurance coverage "for your protection." The protection intended is that mentioned in the preceding paragraph as well as additional conditions preceding these paragraphs and not reported here. If the proposed insurance policy contained coverage which would show protection of the owner against its own negligent acts (see, for example, the policy in Hospital Service Dist. No. 1 v. Delta Gas, Inc., La. App., 171 So.2d 293), it would be possible to say the protection proposed to be covered is that expressed in the policy and hence indemnity would follow as in Hospital Service. However, the policy is not in evidence, and the certificate of insurance does not assist in making such a determination.
For the reasons assigned, the judgments appealed from are affirmed.
AFFIRMED.
BEER, J., dissents with written reasons.
BEER, Judge, dissenting.
I respectfully dissent, being of the view that (1) the trial judge committed reversible error when he commented on the evidence and made his impressions known to the jury on questions which were crucial to the outcome of the trial. The general charge (noted in footnote number 4 of the majority opinion) was insufficient to remedy this defect; (2) the record fails to support any valid basis upon which the jury could properly conclude that Joseph E. Viguerie, Jr. was guilty of negligence which proximately caused injury to Daigle; (3) the indemnity agreement is valid and enforceable; and (4) the award of $164,250 for pain and suffering is excessive, constitutes an abuse of the jury's discretion and should be markedly reduced.
NOTES
[1] Samuel Lang, Leslie L. Inman, John M. Bee, Frederick S. Kullman, David A. Lang, and Carl S. Downing.
[2] Another defendant, The New Orleans Saints, lessee of an adjoining building, were dismissed by summary judgment.
[3] Itemized as follows: Medical Expenses $5,443.70; Loss of wages past and future $45,000; Physical and mental pain and suffering, past, present and future$164,250.
[4] "If during the course of this trial you have gained any impression that the Court has a feeling one way or another in this case then you are instructed that you should completely disregard any such impression. I have attempted to generally keep my mouth quiet during this trial in so much as the case is to be decided by you and you alone."
[5] La., 373 So.2d 498.
[6] See also Novick v. Textron, Inc., La.App., 375 So.2d 730.