GAUDIN, Judge.
Leo J. Simon was seriously injured in an industrial accident on October 15, 1979. A two-inch pipe he was standing on broke and he fell 25 feet to the ground. Subsequently, he filed a tort suit against Occidental Chemical Corporation, formerly Hooker Chemical and Plastics Corporation. At the time of the sued-on occurrence, Simon was employed by H & L Enterprises and doing welding work at Occidental’s plant in Taft, Louisiana.
Following a three-day bench trial in November, 1984, Simon was awarded $957,-633.00 plus past medical expenses, legal interest and court costs.
On appeal, Occidental contends that it was Simon’s statutory employer and that Simon was therefore limited to workmen’s compensation benefits. Also, Occidental argues that the trial judge erred (1) in failing to find Simon contributory negligent or that he assumed the risk, (2) in not finding that Occidental was entitled to indemnity from H & L and its insurer, (3) in awarding lost wages of $128,243.00 to Simon and (4) in awarding $675,000.00 for pain, suffering and disability.
Simon was also awarded $139,278.00 for future loss of wages and $15,115.00 for future medical expenses.
For reasons that follow, we cannot say that the trial judge was manifestly wrong in finding that Occidental had not proven that Simon was a statutory employee and thus unable to maintain and ultimately prevail in this ex delicto action, nor can we say that the trial judge fell into legal error in denying Occidental’s request for indemnity. However, we find the award clearly excessive and we reduce it to $632,633.00, which includes $350,000.00 for pain, suffering and disability instead of $675,000.00.
STATUTORY DEFENSE
We shall consider, initially, Occidental’s argument that Simon was a statutory employee. When Simon fell, he was engaged, along with other H & L employees, in construction of a new 20-inch steam transfer line between boilers at two separate chemical plants at the Taft site. The boilers used different types of fuel, and the purpose of the 20-inch line was to transfer steam from one boiler to another, depending on which type fuel was more economical to use at a particular time. The 20-inch line was to replace a less functional eight-inch line.
There were three tiers or levels of pipes where Simon was working. He was welding a four-inch tie-in line to the 20-inch line, the four-inch line being in the middle tier which was approximately six or seven feet above the lowest tier. After welding on the four-inch line from above, Simon attempted to lower himself onto the bottom tier so he could weld from below the four-inch line. In so doing, he stepped onto a two-inch pipe which gave way, Simon dropping to the ground.
In order to qualify as a so-called statutory employer, Occidental had to show that H & L in general and Simon in particular were performing work within the sphere of Occidental’s trade, business or occupation. It is often difficult to ascertain whether a certain undertaking is included in a principal’s trade, business or occupation. In Lewis v. Exxon Corp., 441 So.2d 192 (La.1983), the Supreme Court of Louisiana, at pages 197 and 198, stated:
“Two elements ... must be met in order for a principal to be considered a statutory employer. First, the ‘work’ must be a part of the principal’s ‘trade, business or occupation.’ Second, the principal must have been engaged in that trade, business or occupation at the time of the injury. Absent either of these two conditions, the injury will not come within the scope of the workers’ compensation program.
“Courts must look to the facts of each individual case to determine whether a particular activity is within the scope of a principal’s trade, business or occupation. Generally, in order for a work or project to be within a principal’s trade, business or occupation, it must be routine or customary, Benson v. Seagraves, 436 So.2d *374 525, 529 (La.1983); Reeves v. Louisiana & Arkansas Railway Co., 282 So.2d 503, 507-08 (La.1973), or some other type of activity which is necessary for the principal’s day-to-day operations. Put another way, the works contemplated by the statute are those activities which are an actual part of the nature and purpose of the principal’s enterprise. Extraordinary or nonrecurring constructions or repairs usually are outside the scope of the trade or business of manufacturing or production concerns. See 1C A. Larson, The Law of Workmen’s Compensation § 49.-12, at 9-24 to 29 (1982).”
In a later opinion, Rowe v. Northwestern Nat. Ins. Co., 471 So.2d 226 (La.1985), the Supreme Court again emphasized that the determination of whether a principal is a statutory employer is a factual question and must be decided on a case by case basis.
Here, Occidental was in the business of making chlorine and was not in the welding or construction business. Although Occidental employed 87 maintenance people, there was sufficient testimony indicating that the installation of the 20-inch steam transfer line was unaccustomed construction and that Occidental did not employ welders able to do this job.
Robert J. Mayeaux III, a chlorine process foreman and an 18-year Occidental employee, said that Occidental hired welders when welding work had to be done. He was asked: “And do you know of any Hooker (Occidental) welders that did construction work for Hooker (Occidental) themselves?” His response: “Not offhand.” H & L had contracted with Occidental[1] on May 1,1972 whereby H & L was to “... assume responsibility for such maintenance, repair, renovation or minor new construction work ...” as Occidental would from time to time assign. Under the terms of this broad assignment, it was possible for H & L to perform tasks within Occidental’s trade, business or occupation and possible for H & L to undertake new or exceptional endeavors outside of Occidental’s trade, business or occupation. In any event, we cannot say that the trial judge was manifestly wrong in deciding that the scope of the contract covered maintenance and repairs and new construction and that the welding work on the new 20-inch steam transfer line was beyond Occidental’s trade, business or occupation. The record supports these conclusions, particularly if the trial judge placed more credence in Simon’s witnesses than in Occidental’s.
In her “Reasons for Judgment,” the trial judge said:
“In this case, there is no evidence that Occidental routinely or customarily installed new lines. Nor was the work ‘necessary for the principal’s day-to-day operations.’ This was non-recurring work, a one-time construction of a new pipeline to connect the fuel units of two separate plants for purposes of economy. There is no evidence that Occidental was either equipped to handle this kind of construction with its own employees or that it had done similar construction with its own employees in the past. It is clear from the testimony of the H & L employees that the work performed by the construction crew, which would change the general operation of the plant, was not a part of the trade, business, or occupation of Occidental. Even though plaintiff’s crew may sometimes have performed maintenance, the owner will not be allowed to avoid liability to the employee of a contractor by requiring some maintenance work to be done by employees hired primarily for a construction project. The ‘statutory employer’ defense is not available to Occidental.”
An appellate court should not upset factual findings of the trial judge if there is a reasonable factual basis for the findings and the findings are not manifestly wrong. See Arceneaux v. Domingue, 365 So.2d 1330 (La.1978), and numerous subsequent cases with synonymous holdings.
*375 OTHER DEFENSES
We turn now to Occidental’s contentions that Simon was contributorily negligent or that he assumed the risk. Occidental does not strenuously argue that its negligence was not involved in the painting over and the failure to remove the badly deteriorated and unused two-inch pipe that collapsed under Simon. The repainted pipe looked new and strong, and Occidental had at least constructive knowledge of the defective condition. Instead, Occidental contends that Simon should have used a safety belt while working in the pipe racks.
The following colloquy is between Simon, under cross examination, and Occidental’s counsel:
“Q. You have testified here today that there was no way you could have used a safety belt; is that right?
A. Right.
Q. Don’t you really mean, Mr. Simon, that it would have just been more inconvenient for you to use it, but you could have used it?
A. If I had had it on, when I got down, I wouldn’t have had it hooked up, you know, because I was coming down. Even though I would have had a safety belt, the accident would have happened the same way, because I was coming down.
Q. You could have hooked up on the pipe level on the middle rack couldn’t you? You could have looped that line around one of those pipes on that rack, and then moved down to the first level, couldn’t you?
A. How could I have done that? That rope is about four or five feet. And in between the pipes is about six or seven feet. How could I hook it up and come down? There is no way. You had to unhook it and come down and then hook it up back.”
Later, Simon said:
“Even though I would have had a safety belt, the accident would have happened because I wouldn’t have it hooked up. I was coming down.”
Carol W. Berzas, Sr., Simon’s foreman, said that while Simon was descending from the middle tier to the bottom level, he (Simon) could not have used a safety belt. Although several of Occidental’s witnesses testified to the contrary, the trial judge made this finding:
“Even if plaintiff had worn a safety belt, the accident would not have been prevented because plaintiff could not have made the transition from the middle to the lower level of the rack while keeping his safety belt attached to a safety belt cable or to a pipe. His not wearing a belt was not a cause in fact of the accident.”
Testimony in the record supports this factual determination, and we will not disturb it, in accord with Arceneaux v. Domingue, supra.
INDEMNITY
Regarding possible indemnity by H & L and its insurer, Hartford Accident & Indemnity Company, to Occidental, this portion of the contract is pertinent:
“Contractor agrees that it shall indemnify and hold owner harmless of and from any and all claims of whatsoever kind or nature, including, but not limited to, injuries to or death of persons and damage to property (including property owned by the owner, the Contractor and third persons) arising out of or related to the performance of services and work under the Agreement. This indemnity includes without limitation injuries to or death of persons or damage to property resulting (i) from the use or possession of any tools or equipment loaned or furnished to Contractor by the Owner, (ii) from or due to the joint negligence of the Contractor and the Owner, or their respective agents, or employees, and all costs and expenses relating to the defense of any such claims, including reasonable attorney’s fees incident thereto. However, Contractor’s liability under this indemnity provision shall not exceed the limits of insurance required to be in force under this Agreement. Wherever Contractor is *376 authorized to use subcontractors for the performance of any work hereunder with prior written permission of owner, Contractor will cause a similar agreement to be executed and delivered by such subcontractors.”
The trial judge said:
“The terms of this indemnity agreement provide indemnity for injury resulting from the joint negligence of the contractor and owner but is silent as to sole negligence of the owner or to strict liability of the owner. This court cannot supply the intention of the parties to the indemnity agreement to extend application of the agreement to such sole negligence or to strict liability of the owner. An intention to indemnify a party for its own negligence or for strict liability is never presumed. It must be explicitly stated. H & L has no indemnity obligation to Occidental in this ease.”
The trial judge apparently felt that the terms and conditions of the contract applied to the job Simon was doing, a fact disputed by H & L and its insurer because Simon was not a statutory employee doing welding and/or maintenance work within the scope of Occidental’s trade, business or occupation. In any event, we are guided by this language from Polozola v. Garlock, Inc., 343 So.2d 1000 (La.1977):
“A contract of indemnity whereby the indemnitee is indemnified against the consequences of his own negligence is strictly construed, and such a contract will not be construed to indemnify an indemnitee against losses resulting to him through his own negligent act, unless such an intention was expressed in unequivocal terms. Lee v. Allied Chemical Corp., supra [331 So.2d 608 (La.App. 1st Cir.1976) ]; Strickland v. Nutt, 264 So.2d 317 (La.App. 1st Cir.) cert. denied, 262 La. 1124, 266 So.2d 432 (1972); Elephant, Inc. v. Hartford Accident & Indemnity Co., 216 So.2d 837 (La.App. 1st Cir.1968), on remand, 239 So.2d 692 (La.App. 1st Cir.1970); Arnold v. Stupp Corp., 205 So.2d 797 (La.App. 1st Cir.1967); Jennings v. Ralston Purina Co., 201 So.2d 168 (La.App. 2d Cir.), cert. denied, 251 La. 215, 203 So.2d 554 (1967).”
Thus, we cannot say the trial judge erred in ruling that the contract’s wording did not express in unequivocal terms H & L’s duty to indemnify Occidental for its (Occidental’s) acts of negligence.
Occidental argues that it was the intent of the parties for H & L to make indemnification, and it cites Polozola v. Garlock, Inc., supra, wherein the Supreme Court, at page 1003, said:
“... when there is anything doubtful in agreements, including indemnity agreements, we must endeavor to ascertain what was the common intention of the parties, rather than adhere to the literal sense of the terms.”
However, the contract here is not uncertain. Occidental is to be indemnified (1) for claims resulting from use of tools or equipment loaned or furnished to H & L by Occidental or (2) from or due to the joint negligence of Occidental and H & L. The agreement does not, as the trial judge noted, cover injuries caused by Occidental’s sole negligence. The contract specifies “joint negligence” and thereby indicates the parties’ intent.
While we do not comment further on H & L’s major objection to indemnity — i.e., that the contract does not apply to Simon’s situation as he was not a statutory employee when injured — we nevertheless recognize the probable soundness of such a position. Assuming, arguendo, that the contract’s indemnity provisions are applicable to Simon, we agree with the trial judge’s rejection of Occidental’s attempt to have H & L make indemnification.
DAMAGES
Appellant complains because $128,243.00 was awarded for pain, suffering and disability and $675,000.00 in general damages.
When he was hurt, Simon was earning $9.60 per hour. Appellant’s expert economist testified that if Simon worked a 40-hour week and had received a five per cent *377 increase in salary, his lost wages from time of injury to trial would total $99,132.43.
Simon’s economic expert, on the other hand, testifying from Occidental’s payroll records and noting that Simon worked an average of 5.2 overtime hours each week, placed appellee’s lost income at $128,243.00. The trial judge was not in error in relying on the figures supplied by Simon’s expert as payroll documents showed the overtime hours either overlooked or ignored by Occidental’s expert.
In its brief, Occidental did not specify future wages in its assignment of errors. Later in its brief, Occidental did contend that the trial judge should have used the discount figure of 11.5 per cent referred to by its expert instead of a lesser discount figure testified to by Simon’s expert.
The choice of an appropriate discount rate falls within the discretion of the trial judge. As there was expert testimony supportive of the awards for past and future wages and as these awards appear to be reasonable, we will not lower them.
The award for pain, suffering and disability is another matter. In Coco v. Winston Industries, Inc., 341 So.2d 332 (La. 1976), the Supreme Court, in addressing an abuse of discretion issue, stated at page 335:
“We do reemphasize ... that before a Court of Appeal can disturb an award ... the record must clearly reveal that the trier of fact abused its discretion... “Only after making the finding that the ... lower court abused its much discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded that court...”
At the time of his injury, Simon was 48 years of age with a 7th grade education. He had been employed for 24 years at Avondale Shipyards as a welder before going to H & L. Since October 15, 1979, he has not worked. Both at Avondale and at H & L, Simon had an exemplary record, missing only one day of work in 27 years.
In her “Reasons for Judgment,” the trial judge said that in awarding damages she relied on the medical reports of Drs. Richard McCall, George Burkett, Robert D’Ambrosia and Jefferson Kaye and Dr. Pete Rhymes. Simon fractured both wrists and his right hip when he fell.
All of the physicians noted that Simon had a preexisting congenital hip defect. While Simon admitted that he had a slight limp before the accident, he said that he was never bothered by this defect and obviously it did not interfere with his employment as a welder.
Simon was taken immediately to Ochsner Foundation Hospital after the fall. He sustained, according to the hospital report in evidence, “... severely comminuted fractures of both radii and a relatively mondis-placed fracture of the right acetabulum. Initial treatment consisted of reduction of the fractures and pins in plaster for maintenance of reduction, both wrists, under general anesthesia. The pelvic fracture necessitated bedrest and the patient was continued in Ochsner Foundation Hospital until the 8th of November, 1979.”
Following his discharge for bedrest at home, Simon returned to Ochsner 10 days later. The hospital report signed by Dr. McCall, continues:
“He was seen in the emergency room the 18th of November 1979 with complaint of pain over the pin site in the left ulnar. He was admitted to the Ochsner Foundation Hospital and the left ulnar pin removed. On the 23rd of November, he underwent removal of the remainder of the pins and re-application of short arm plasters. X-rays taken at that time revealed early consolidation of the fracture fragments, but a loss of the normal anatomic relation of the radiocarpal joints bilaterally. The pelvic fracture had healed uneventfully and the patient was fully ambulatory. The patient was discharged from Ochsner Foundation Hospital on the 24th of November, to continue convalescence at home. I anticipate that *378 he will need three to four weeks of further immobilization in plaster and begin mobilizing both wrists.
“At this point it is difficult to say what the final result will be. However, I feel it is safe to state that with the disruption of the normal anatomic relationship of the radius and carpal bones in both wrists, that he will possibly have one or two painful radiocarpal joints. There is also the possibility of some loss of range of motion. Either of these problems may result in Mr. Simon not being able to return to his previous occupation. It is my feeling that there is a strong possibility that Mr. Simon will be disabled from his injuries, but it is too early at this time to state that with any certainty.”
In her “Reasons,” the trial judge quotes from Dr. McCall’s reports of January 10, February 11, and March 17, 1980, as follows:

January 10

“The acetabular fracture was not significantly displaced but the trauma of the fracture superimposed upon the previous hip deformities has resulted in a painful hip on the right. He is asymptomatic on the left hip.”

February 11

“... it is also entirely possible that in the future Mr. Simon will need a total hip replacement on the right for symptomatic problems.”

March 17

“Mr. Simon is still having pain in the right hip which I feel is due to the pre-ex-isting degenerative changes which have been aggravated by the acetabular fracture. His hip was completely asymptomatic prior to his injury and I feel that the fracture into the acetabulum has resulted in the symptoms that he is now having even though the arthritic condition probably preexisted the injury.”
On January 2, 1981, Dr. McCall wrote: “Mr. Simon returned to my office the 18th of December 1980 for a follow-up by both myself and Dr. Kaye for multiple problems. As you know he had bilateral distal radial fractures in the past which were treated with pins and plaster. He has developed subluxation of the ulna bilaterally and early degenerative changes in both radial carpal joints. Dr. Kaye has been following the right wrist which is the more symptomatic of the two. He has injected the wrist twice with good relief, but there is still a possibility that surgery may be indicated in the future. Mr. Simon is still having discomfort with the right hip secondary to his fall and aggravation of preexisting degenerative arthritis. Because of his multiple problems I feel that Mr. Simon will be 100% permanently disabled from any occupation.
Dr. Burkett’s reports are dated February 11, 1981 and January 8, 1982. In the first report, he said:
“Mr. Simon’s complaints are referable to the right hip and to both wrists. He has no difficulty with his left elbow.
“The patient states that as far as his right wrist is concerned, he is unable to pick up any heavy objects and anything that he does bothers him.
“The patient states that his left wrist has the same problems but not as severe.
“The patient states that he has a right-sided limp and he has discomfort in the region of his right buttocks which radiates down the posterior aspect of the right thigh. He has no right groin pain.
“The patient was asked what he did most of the day, was rather hesitant to reply stating that he does very little — sometimes around the house and the garden, and his wife believes that he does nothing but look at soap operas all day.”
On January 8, Dr. Burkett stated:
“Mr. Simon has reached maximum improvement and has a residual disability of 25 per cent permanent partial disability of the right and left wrist and has a 40 per cent residual disability of the right lower extremity.
“This patient has bilateral old Perthe’s disease and it appears as though the injury to the acetabulum on the right has aggravated the preexisting disease.
*379 “In the year’s interval there is a noticeable decrease in the range of motion of the right hip.
“While maximum benefit of medical treatment has occurred at this level if sufficiently disabled, further surgical procedures would be indicated.”
Dr. D’Ambrosia, professor of orthopaed-ics at the LSU Medical Center, examined Simon on February 28, 1984. From his report:
“X-rays were reviewed of his hips. It would appear that he has had Legg-Perthes disease from childhood bilaterally in both hips. He has superimposed problems on the right hip, where it appears there have been fractures of the acetabulum and some irregularities there, showing that there was some displacement of the fracture site which has accentuated the degenerative arthritis phenomenon on the right hip. X-rays of his wrist show severe degenerative arthritis of both wrists with loss of radial height and impingement on the ulna, particularly on the left hand.”
Dr. Rhymes, the orthopaedic surgeon who testified at the trial, first examined Simon on March 2, 1982 and has continued to see him, Dr. Rhymes said, “every four to six months.” Simon consulted Dr. Rhymes because of continuing pain. Dr. Rhymes said that Simon “... eventually ... would have to have surgery on his wrist to try to decrease some of the arthritic changes in the wrist, to take out further bones or put in an artificial wrist prosthesis, and that eventually he would have to have a total hip prosthesis put in.”
Surgery, Dr. Rhymes went on, would be no guarantee that Simon would be relieved of discomfort. Dr. Rhymes stated:
"... one of the reasons I’m advising him not to jump into it (the surgery) because it’s not a panacea. Likewise, particularly with the hip surgery, the average, worldwide good results is about 10 to 12 years. And this would mean that based on the average and with Mr. Simon’s age, I would anticipate that it would have to be redone at least once, maybe twice.”
Shirley Simon, appellee’s wife of 37 years, testified that her husband is “... 55 years old, but he has an 80-year-old body.”
In essence, Simon is now 56 years of age, unemployed, living with some degree of wrist and hip pain and a likely candidate for future surgery. In contending that Simon’s awards were excessive, Occidental suggests that Simon’s pain is not as severe as he said it was and that two physicians, Drs. Burkett and Kaye, said that Simon could resume some type of employment. Dr. Burkett said:
“The physical findings and x-rays would indicate that this patient is employable. He still has some weak abductors on the left which would be strengthened with physical therapy. However, he is able to get about according to the history and from the point of view of this examination within a limited scope. It would not be recommended that the patient do a great deal of walking but walking for short distance at a time should be possible. This patient has been able to do, according to the history, occasional work around the house and yard and occasional rabbit hunting.
“This patient is capable of working even with the discomfort complained of in both wrists.
“He could certainly do clerical work or at least be trained to do clerical work, or light work, or even taxi driving.”
Dr. Kaye, who was plaintiff’s treating physician at Ochsner Foundation Hospital, stated:
“Mr. Simon is 52 years old and tells me that he has been a welder during his entire working career. He has very limited education. He says that the rehabilitation specialists have been by to see him at his house and said that they found him some jobs doing light duty type work at somewhere between $4.00 and $6.00 an hour, but Mr. Simon says that these jobs are very far from his house in the country and that his gas expenses would out-weigh his income.
*380 “I am convinced that with heavy lifting, stooping, bending and squatting, Mr. Simon would not be able to return to work as a welder in any capacity. In my opinion, he is totally disabled from returning to work as a welder. On the other hand, I readily admit that he can perform light duty work, such as was outlined by Crawford Rehabilitation Services, but Mr. Simon says that he cannot do this for the reasons that I listed above.”
Testimony indicated that Simon can and does drive a truck with a standard transmission and that he does, according to Dr. Rhymes, have good muscle tone and strength. Simon also enjoys social activities like going to a hunting camp on Saturday nights with friends.
In Anderson v. Welding Testing Laboratory, Inc., 304 So.2d 351 (La.1974), cited in the Coco decision, the Supreme Court declared:
“The awards made in other cases provide no scale of uniformity; their use is limited to serving as an aid to determine, if the present award is greatly disproportionate to similar awards (if truly similar), whether an issue of abuse of discretion may exist in the present case.”
Occidental, in its effort to convince this Court that awards in like cases are much lower than here, listed five reported decisions where the awards ranged from $45,-000.00 to $271,901.11. None of the cases, however, had facts and circumstances, medical or otherwise, precisely the same as Simon's. Simon’s brief, too, offers little jurisprudential assistance to this Court; he does not cite any cases where awards were made.
We have examined this record to see if the evidence, when viewed in the interpretation most favorable to Simon, a test outlined in Schexnayder v. Carpenter, 346 So.2d 196 (La.1977), and we are of the opinion that Simon’s personal and medical facts do not substantiate an award for pain, suffering and disability beyond $350,-000.00. Any award in excess of this sum would constitute an abuse of discretion.
In both Cullivan v. State Farm Mutual Automobile Insurance Company, 428 So.2d 1231 (La.App. 3rd Cir.1983), and Landry v. Bill Garrett Chevrolet, Inc., 443 So.2d 1139 (La.App. 4th Cir.1983), the sum of $500,000.00 was awarded in general damages for injuries far more serious than those sustained by Simon. In Cullivan, the plaintiff suffered multiple leg and rib fractures, lung injuries and elbow joint lacerations, and he developed gangrene in his feet and had both legs amputated. Thereafter, he was confined to a wheelchair.
The petitioner in Landry suffered multiple fractures of the chest, ribs, left clavicle and skull, with resulting brain damage that destroyed his ability to think in abstract terms and his ability to plan events, handle finances and care for himself. He had difficulty walking and his personality was altered, causing him to break out in uncontrollable tears. He also experienced episodes of rage and anger.
This Court, in Champagne v. Lee, 470 So.2d 378 (La.App. 5th Cir.1985), reduced an award for general damages from $1,000,000.00 to $350,000.00. Although the plaintiff in Champagne was a mother with an unborn child who sustained extreme pain, suffering and emotional distress and who was left with a herniated disc and lumbar instability, injuries admitted unlike Simon’s, we are of the opinion that the two cases, Champagne and Simon’s, belong in the same monetary classification insofar as general damages are concerned.
Simon is receiving considerably more in past and future lost wages than the Champagne petitioner.
We are not merely substituting our opinion for that of the district judge. Most general awards for fractured wrists and hips are much lower than $350,000.00, but Simon’s past pain, suffering and disability plus the anticipated anguish of future surgery justify a higher-than-usual sum.
DECREE
All segments of the 29th Judicial District Court judgment of April 10, 1985 are affirmed except the award for pain, suffering *381 and disability, which is hereby reduced from $675,000.00 to $350,000.00. Appellant is to bear all costs of this appeal.
AMENDED IN PART AND, AS AMENDED, AFFIRMED.

. The contract was actually entered into by Hooker Chemical Corporation, Occidental’s parent company, and Falcon Corporation, H & L’s ancestor company.