CUTRER, Judge.
This is an appeal by the State of Louisiana, through the Department of Transportation and Development and the contractor, H & S Construction Company, Inc., and its insurer, from a trial court judgment awarding Sally Bantin damages she incurred when her vehicle struck a raised manhole in a street (La. U.S. 190) that was under construction in Opelousas, Louisiana.
On April 4, 1973, at approximately 3:30 P.M., plaintiff was driving her automobile north on Union Street in the city of Opelou-sas. She started to cross the intersection of Vine and Union Streets when her car came to a sudden halt throwing her into the steering wheel of the car. She suffered bruises to her abdomen, legs and face. Upon investigation, it was discovered that the crossmember of the frame of her car had hit a protruding manhole which had been raised during the road construction on Vine Street. Suit was filed against the State of Louisiana through the Department of Transportation and Development (State), H & S Construction Company, Inc. (H & S), and its insurer, Northwest Insurance Company (Northwest), for damages due to personal injuries and property damage.
*67 The trial court rendered judgment against the defendants, in solido, for general damages in the amount of $25,000.00. Damages for past and future medical expenses, vehicle damage and wrecker service were also awarded.
The State, H & S and its liability insurer appeal[1] presenting the following issues:
(1) Whether the State and/or H & S were negligent;
(2) Whether plaintiff was guilty of contributory negligence;
(3) Whether the general damages awarded were excessive; and
(4) Whether the State is entitled to indemnity from H & S and its insurer.
LIABILITY OF THE STATE AND/OR H & S
The State contracted with H & S for the resurfacing of Vine Street (also known as U.S. 190) in the city of Opelousas. The existing asphalt surface was removed. It was then discovered that the subbase of the highway had deteriorated requiring that it also be removed. After this removal, and before resurfacing began, it was necessary to raise several manholes along Vine Street in order that they would be level with the surface of the new asphalt when it was applied. One of these manholes was located close to the middle of the intersection of Vine and Union Streets.
The plaintiff was proceeding north on Union Street approaching the Vine Street intersection. She was driving slowly. A witness who was following plaintiff stated that he was traveling 10 to 12 miles per hour and the plaintiff’s car was not pulling away from him. Plaintiff started through the intersection, intending to travel over the manhole. The crossmember of the frame of her car caught the protruding manhole; the car halted abruptly, causing her injuries and car damage.
Two signs had been placed along Union Street warning the public of “construction ahead” and “bump.” There were no signs, barricades or any other warnings of the specific danger of a protruding manhole.
The cause of the accident in question was the unusual height of the manhole above the level of Vine Street. The estimates of its height by the various witnesses varied from four to eight inches. Robert Wolf, an engineer, stated that the ground clearance of plaintiff’s car was five inches. This being so, the manhole was protruding slightly more than five inches as the frame of plaintiff’s car struck the manhole near its top.
Andrew Quirk, the construction engineer for the State, testified that barricades around the manhole had previously been installed but truck traffic frequently struck the barricades causing a problem of maintenance. Quirk decided that the motorists would be protected if a beveled ring of asphalt would be placed around each manhole. He explained that he informed H & S employees to install such a bevel and to do so using a ratio of one inch to twelve inches. By ratio of one inch to twelve inches he explained that, for each inch of manhole height, the ring of asphalt would extend outward twelve inches. If the manhole was five inches high, the ring of asphalt would begin at the top of the manhole and would be beveled outward for 50 inches in all directions around the manhole. He stated that the beveled asphalt, placed upon a one inch to twelve inches ratio would allow vehicles to safely travel over the manhole without striking it with their undercarriages.
The evidence is clear that, in this case, the height of the manhole was near five inches. It was equally clear that the beveled asphalt extended outward no. more than two feet from the manhole. A vehicle traveling over the manhole would not be protected from striking the manhole ring with its undercarriage. The bevel had been placed upon this manhole several days before the accident. The asphalt used in the beveling process was beginning to deteriorate when the accident occurred.
*68 Both the State and H & S had employees on this job whose responsibility was to attend to the safety of the public and to rectify any hazardous condition that might have existed. These persons had the authority and duty to order the immediate correction of any hazardous condition.
The question arises as to whether the State and/or H & S performed the duty to protect the public against the hazardous condition under the facts presented.
The general principles regarding the State and its contractor’s duties to the public while highway construction is in progress is set forth in the case of Knotts v. State, Dept. of Highways, 395 So.2d 419, 422, 423 (La.App. 3rd Cir. 1981), writ den., 400 So.2d 669 (La.1981), wherein this court held as follows:
“We recognize the necessity of construction along our highways and that hazards will often necessarily exist during the course of construction. We are aware that the general duty of the Department to maintain the highways in a reasonably safe condition are relaxed somewhat in connection with construction activities. This duty, however, is relaxed according to the reasonable necessities of the circumstances. Hazardous conditions, created by construction work on a highway, must be remedied within a reasonable length of time. It is a breach of the Department’s duty to allow a hazardous condition to exist for an unreasonable length of time, particularly when it is within the capability of the Department to eliminate the hazard.
“ ‘What constitutes a reasonable time to complete construction and to eliminate construction defects depends upon the circumstances of each case and involves consideration of factors such as the extent of the project, emergencies, availability of materials and manpower, priorities of projects, safety and economic aspects of construction, the nature and degree of the hazard created, the ability to adequately warn, and other factors.’
“Brandon v. State, Through Dept. of Highways, 367 So.2d 137, 143 (La.App. 2nd Cir. 1979), writs ref’d, 369 So.2d 141 (La.1979).

“The jurisprudence holds that anyone contracting with the Department to do road repair is obligated not to expose the traveling public to undue hazards. Hale v. Aetna Casualty & Surety Co., 273 So.2d 860 (La.App. 2nd Cir. 1973), writ den., 275 So.2d 867 (La.1973).”
As we apply these principles to the facts herein, we have no difficulty in agreeing with the trial court’s conclusion that both the State and H & S were negligent when they knowingly allowed the manhole hazard to exist which was the cause of the accident and injuries to the plaintiff. The lack of proper warnings, barricades, or the improper installation of the asphalt bevel round the manhole was a breach of duty both by the State and H & S. Both the State and H & S had inspectors on this job to protect the public from such a hazard. They had authority to make any necessary corrections to accomplish such duty. These employees of the State and H & S failed in their duties. Thus, both the State and H & S will be liable for plaintiff’s damages unless she was contributorily negligent.
CONTRIBUTORY NEGLIGENCE OF PLAINTIFF
The State alleges that plaintiff’s vehicle was defective and thus did not have the proper ground clearance. This argument lacks merit. The evidence simply does not support such a contention. It was not shown that the ground clearance of plaintiff’s vehicle was unusually low nor did defendants prove that the vehicle was defective.
The defendants also contend that plaintiff was negligent by not seeing the height of the manhole and going around same. Even though plaintiff could see the protrusion of the manhole, it was not shown that plaintiff could have been able to judge its height and then make a determination *69 whether her vehicle would clear the manhole when she went over it. A motorist has a right to assume that the highway is safe and maintained in a reasonably safe condition. Without any barricades or other warnings around the manhole, plaintiff had a right to assume that she could safely traverse the intersection, traveling over the manhole. We conclude that the plaintiff was free of negligence.
INDEMNITY
The State appealed the trial judge’s dismissal of its demand for indemnity from H & S. The trial court found that the indemnity agreement did not express an agreement to hold the indemnitee harmless on account of its own negligent acts. The relevant section of the Louisiana Standard Specifications for Roads and Bridges (1977 edition) which pertains to the indemnity claim of the State is:
Section 107.16:
“The contractor shall indemnify the Department, its officers and employees from all suits, actions or claims of any character brought because of any injuries or damage received or sustained by any person or property on account of the operations of the said contractor; or on account of or in consequence of any neglect in safeguarding the work; or through use of unacceptable materials in constructing the work; or because of any negligent act, omission or misconduct of said contractor; or because of any claims or amounts recovered from any infringements of patent, trademark or copyright; or from any claims for amount arising or recovered under the Workmen’s Compensation Act or any other law, ordinance, order or decree; and so much of the money due the said contractor under and by virtue of his contract as may be considered necessary by the Department for such purpose, may be retained for the use of the State; or, in case no money is due, his surety may be held until such suit or suits, action or actions, claim or claims for injuries or damages as aforesaid have been settled and suitable evidence to that effect furnished to the Department; except that money due the contractor will not be withheld when the contractor produces satisfactory evidence that he is adequately protected by public liability and property damage insurance, including railroad protective liability insurance in accordance with Subsection 107.08.”
The State argues that this indemnity agreement requires the contractor to indemnify the State from all actions arising due to work undertaken by the contractor, including the claim herein. We conclude that such indemnity agreement does not impose an indemnity obligation upon H & S since the State was also negligent.
In Polozola v. Garlock, Inc., 343 So.2d 1000, 1003 (La.1977), the Supreme Court stated:
“A contract of indemnity whereby the indemnitee is indemnified against the consequences of his own negligence is strictly construed, and such a contract will not be construed to indemnify an indemnitee against losses resulting to him through is own negligent act, unless such an intention was expressed in unequivocal terms.” (Citations omitted.)
In Green v. Taca International Airlines, 304 So.2d 357, 361 (La.1974), the Supreme Court, in passing on applicability of an indemnity agreement, stated:
“Agreements have the effect of law between the parties, and the courts are bound to give effect to all such contracts according to the true intent of the parties. That intent is determined by the words of the contract when they are clear and explicit. La.Civil Code art. 1945 (1807). Additionally, a contract of indemnity will not be construed to indemnify the indemnitee against losses resulting to him through his own negligent acts, where such intention is not expressed in unequivocal terms. This rule is equally applicable whether the damage is caused by the sole negligence of the indemnitee or the concurrent negligence of the in-demnitee and indemnitor.”
See also, Daigle v. Lang, 377 So.2d 1384 (La.App. 4th Cir. 1979), writ den., 381 So.2d *70 510 (La.1980); LSA-C.C. articles 1945-1955. We find no language in the indemnity contract which would make H & S an indemnitor of the State’s own negligent acts. The State’s contention that it is entitled to indemnity from H & S for its own negligent acts is without merit.
GENERAL DAMAGES
The State contends that the trial court’s general damages award of $25,-000.00 was excessive.
The trial judge, in his reasons for judgment, fully set forth the injuries and resulting medical problems incurred by plaintiff in the accident. We adopt such reasons as our own:
“Mrs. Bantin was taken by police officer Alexander Peck to the office of Dr. Seldon Deshotels, who attended her. He then referred Mrs. Bantin to Dr. Richard Bidstrup, an ear, nose and throat specialist so that she could receive further attention and treatment. Dr. Bidstrup, who examined the plaintiff five days subsequent to the accident, found her to have suffered a nasal septal fracture with subluxation of the quadrangular cartilage from the maxillary crest, which left a depression of the cartilaginous portion of the dorsum of the nose, and several small chip fractures of the nasal bone. The doctor also found her to have sustained a severe deflection of the nasal septum with a compromise of the nasal airway.
“Dr. Bidstrup scheduled Mrs. Bantin for surgical repair of her nose, and on April 18, 1979, he performed an open reduction of the fracture and reconstructed the bridge of her nose. During the forty-eight hours after the surgery, when her nose remained packed, she suffered intense pain. She was discharged from the hospital on April 21, and five days later when she was seen again by Dr. Bidstrup, her pain was not so severe as when he had first examined her, nor as it had been during the immediate post-operative period; and the swelling of her face had subsided considerably.
“On August 7, 1979, Dr. Bidstrup noted that the plaintiff had a mild nasal defect or depression on the dorsal portion of the nose; and although Mrs. Bantin’s nose had been straightened by the surgery and a good airway had been achieved, in the course of the healing process, her nose returned somewhat to its post-traumatic state. Mrs. Bantin suffered difficulty in breathing through her nose, a condition which in Dr. Bidstrup’s opinion was not profound, and would be aggravated by nasal congestion and allergies.
“It was Mrs. Bantin’s testimony that one week after the accident, except for the condition of her nose, the other soreness and bruises occasioned by the accident disappeared. She maintained, however, that her senses of smell and taste have greatly diminished since the accident, that she has difficulty breathing, and that she suffers periodic pain from the tip of the bridge of her nose to her cheek and teeth.
“Mrs. Bantin’s testimony is corroborated by Dr. Darryl Henderson, a specialist in plastic and reconstructive surgery, whom she consulted in November of 1979. On examination, Dr. Henderson found the plaintiff to have depression on the top part of her nose with a dorsal hump, giving her nose an S-shaped appearance. Dr. Henderson further explained his findings by referring to photographs of the plaintiff which have been attached to his deposition. He noted that Mrs. Bantin’s nose appears drooped on her lip with a too-small angle between her lip and nose. He also observed that her nasal pyramids are wider than they should be, and that her nostrils, which should be elliptical, are round-shaped and not quite symmetrical.
“Dr. Henderson found Mrs. Bantin’s nasal airway to be diminished on both sides with her nasal terminals too large and blocking air flow. He estimated a $1600.00 surgical fee for the repair of this condition, in addition to hospital expenses of some $1200.00 to $1600.00. He stated also, that if the repair were performed at the Surgery Clinic her expense for the Surgery Clinic would be approximately *71 $575.00 to $850.00, as opposed to the greater hospitalization costs if surgery were performed in the hospital. It was his testimony, too, that if Mrs. Bantin underwent surgery she would require a nasal pack for one week after surgery and that her post-operative pain would decrease as healing progressed. He stated also that in his opinion surgery would improve her appearance and breathing, but that it may not improve her diminished sense of smell, which was occasioned by the accident.”
As we examine damage awards, we are guided by the principles enunciated in the case of Coco v. Winston Industries, Inc., 341 So.2d 332, 334 (La.1976), where the Supreme Court held as follows:
“ ‘Unless the record demonstrates that the trial court abused the “much discretion” provided for in fixing damages (C.C.1934), the appellate court should not disturb the award.. .. The question is not whether a different award might have been more appropriate, but whether the award of the trial court can be reasonably supported by the evidence and justifiable inferences from the evidence before it. That such evidence might also support a greater (or smaller) award will not justify a change in the amount by the appellate court.’ ....

“ ‘A reviewing court might well disagree with the amount of the award fixed by the jury, but it is not entitled to substitute its opinion for that of the trier of fact.’ .. . . ”
We find no abuse of discretion by the trial court in its award of $25,000.00 to plaintiff as general damages.[2]
For the foregoing reasons, the judgment of the trial court is affirmed. Costs of this appeal shall be paid by the defendants-appellants.
AFFIRMED.

. A motion to dismiss the State’s appeal was filed by H & S and its insurer. This motion was denied in a separate opinion. Bantin v. State of Louisiana, through the Dept, of Trans. & Development, et al., - So.2d -(La.App. 3rd Cir. 1981), Docket Number 8489.

. We have been referred to the case of Oglesby v. Donald M. Clement Con., Inc., 367 So.2d 1328 (La.App. 4th Cir. 1979), where $20,000.00 was awarded for similar injuries.